COMMONWEALTH *vs.* RONALD E. JOHNSON.

Suffolk.    November 2, 1976. — February 10, 1977.

Present: HENNESSEY, C.J., BRAUCHER, QUIRICO, & WILKINS, JJ.

*Jury and Jurors.    Identification.    Constitutional Law.* Identification, Admissions and confessions.    *Evidence,* Admissions and confessions, Hospital record.

At the trial of an indictment for murder in the first degree, it was not error for the judge to question each juror as to whether his opinion with respect to capital punishment would prevent him from finding the defendant guilty and to excuse two jurors who felt they would be unable to return a verdict of guilty if that verdict could result in the imposition of capital punishment. [866-867]

A defendant in a criminal trial was not prejudiced by a newspaper article which contained a portion of the Commonwealth's opening statement outlining the expected testimony of its chief witness. [867]

The constitutional rights of a criminal defendant were not violated by the showing of his photograph to a witness without the presence of defense counsel. [867-868]

Evidence at a criminal trial warranted a finding that the defendant knowingly and intelligently waived his Miranda rights prior to making statements to the police. [868-870]

At a criminal trial, there was no error in the admission in evidence of the defendant's records from a Rhode Island hospital which were records required to be kept by the law of Rhode Island. [870-871]

INDICTMENTS found and returned in the Superior Court on February 7, 1973, and February 16, 1973.

The cases were tried before *Zarrow,* J.

After review was sought in the Appeals Court, the Su-

preme Judicial Court, on its own initiative, ordered direct appellate review.

*Michael R. Pizziferri* for the defendant.

*George E. Foote, Jr.,* Special Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J.  The defendant appeals under G. L. c. 278, §§ 33A-33G, from a conviction of murder in the second degree on an indictment charging murder in the first degree and from convictions on indictments charging armed assault with intent to rob and unlawfully carrying a firearm, all stemming from the same incident. The defendant was sentenced to a term of life imprisonment at the Massachusetts Correctional Institution at Walpole on the murder conviction and to lesser concurrent terms on the other two indictments.

The defendant contends in this appeal (1) that his rights under the Sixth Amendment to the United States Constitution were violated because the trial judge questioned prospective jurors with respect to their views on capital punishment and because he excused two prospective jurors who stated that their opposition to capital punishment might preclude their finding the defendant guilty even if they were convinced of his guilt beyond a reasonable doubt; (2) that the trial judge erred in refusing to grant a mistrial on the basis of a prejudicial newspaper article; (3) that the trial judge erred in denying the defendant's motion to suppress identification; (4) that the trial judge erred in refusing to suppress statements made by the defendant while he was in the hospital; and (5) that the trial judge erred in admitting hospital records.

We summarize the pertinent evidence. The incident from which these charges stem occurred at approximately 4 P.M. on January 27, 1973, in a shoe store in the Roxbury section of Boston. Roberto Vasquez, a part time employee, was working in the store with the manager, James Gibson. Vasquez testified that about 4 P.M. Gibson took the gun that he kept under the counter on which the cash register

was located in the front room of the store and went into the back room to use the bathroom. At that time, Vasquez was waiting on a customer. A few seconds thereafter a man whom Vasquez identified at trial as the defendant entered the store. Vasquez asked the defendant if he could help him; the defendant said that he was just looking, and Vasquez turned back to continue helping the customer on whom he had been waiting. As he did so, he heard a click behind him, someone grabbed his arm and he felt what he believed to be a gun in his back. The person who grabbed him instructed him to move to the rear room of the store. Vasquez testified that he recognized the voice as that of the man with whom he had just spoken.

Vasquez further testified that at the command of the defendant, he went to the back room and called "Jimmy." He was able to see the defendant's face as this occurred. Gibson, who was still in the bathroom behind a closed door, inquired what he wanted, and Vasquez responded, "A customer." Gibson flushed the toilet and emerged from the bathroom holding his gun.

The next thing Vasquez remembered was finding himself in the front room of the store. He heard the sound of fighting coming from the rear room and saw shelves moving and boxes shaking. Vasquez saw the defendant back out of the rear room in a crouched position and saw him shoot twice. Vasquez then saw Gibson come out of the back room bent over, holding his stomach, and fall among the chairs.

Vasquez next saw the defendant point a gun at Gibson's head. The defendant then demanded the keys to the cash register. Gibson told him that there was nothing in the register, and the defendant threatened to shoot him in the head. Gibson took the keys out of his back pocket, and the defendant ordered him to get up and go to the register. Gibson did so, inserted the key into the register and then collapsed. The defendant thereupon fled from the store.

A Boston police officer from division 2 testified that he responded to the scene within a few moments of the shooting and found Gibson lying on his back on the floor behind

the register with blood on his chest. The police immediately removed Gibson to the hospital. Gibson suffered from bullet wounds of the neck, chest, and abdomen. He died as a result of his wounds on February 15, 1973.

Vasquez made a positive in-court identification of the defendant as the man who had shot Gibson. Prior to allowing the identification, the trial judge conducted an extensive voir dire on the defendant's motion to suppress the in-court identification. The following evidence was introduced on voir dire. During the incident Vasquez had repeated opportunity to observe the assailant's face. Vasquez gave the police a description of the assailant immediately following the shooting. He was taken to the division 2 police station on the afternoon following the shooting and was shown a group of approximately ten photographs of white and black males between the ages of nineteen and twenty-five, none of which he identified as the assailant. He was thereafter taken to police headquarters and shown additional photographs. He again made no identification. On the morning of Monday, January 29, 1973, police showed Vasquez another group of photographs at his home. Among that group was a photograph of the defendant which Vasquez identified as that of the assailant. Vasquez again identified that photograph during the hearing and also identified the defendant. The motion to suppress was denied, and Vasquez subsequently made his in-court identification repeatedly.

The defendant was arrested by Boston police officers on the evening of January 29, 1973, at the Rhode Island Hospital in Providence, Rhode Island, where he was hospitalized for a bullet wound of the arm. The defendant told police at the hospital that he had come to Rhode Island from Boston by car on Saturday night.

The defendant presented a defense of alibi, consisting of testimony of his wife, his wife's brother, and a friend that he had been at home until shortly before 9 P.M. on the evening in question. There was further testimony that at some time between 9 and 10 P.M. that same evening, the defendant went to the homes of several friends and relatives in

Boston, that his arm was bleeding at that time, and that two of these friends drove him to Providence where he was admitted to the hospital.

1. *Disqualification of jurors.* The defendant's trial took place during the month of January, 1974. During the course of jury selection, the trial judge asked each prospective juror individually whether he held an opinion with respect to capital punishment which would preclude him from finding the defendant guilty of an offense which might be punished by death even if he felt that the Commonwealth had proven all material elements of the crime beyond a reasonable doubt. The judge excused two prospective jurors who felt they would be unable to return a verdict of guilty if that verdict could result in the imposition of capital punishment.

The defendant contends that he was denied by these exclusions a trial by a jury representing a true cross section of the Commonwealth. This contention is controlled by our holding in *Commonwealth* v. *Harrington,* 367 Mass. 13 (1975). In that case, which also involved a trial on indictments for murder and armed assault, we held that *Furman* v. *Georgia,* 408 U.S. 238 (1972), prohibited the imposition of the death penalty under G. L. c. 265, §§ 1, 2. *Harrington* was decided more than a year after the trial in the case now before us. While the trial judge here was in error in his belief that the death sentence might be imposed on a conviction for murder in the first degree, his construction of the interaction of *Furman* with G. L. c. 265, §§ 1, 2, was precisely that on which the trial judge in *Harrington* had proceeded. Given that belief, it was not error for the judge to question prospective jurors regarding whether they held opinions on capital punishment which would prevent them from finding the defendant guilty.

The defendant has not shown that he was deprived of a jury who could fairly and objectively determine his guilt or innocence based on the evidence before them. *Commonwealth* v. *Curry,* 368 Mass. 195, 203-204 (1975). *Commonwealth* v. *Stone,* 366 Mass. 506, 508 (1974). *Commonwealth* v. *Valliere,* 366 Mass. 479, 487-488 (1974).

*Commonwealth* v. *McAlister,* 365 Mass. 454, 458 (1974).

2. *The newspaper article.* During the presentation of the Commonwealth's evidence, the defendant moved for a mistrial on the basis of an allegedly prejudicial newspaper article which had appeared the previous day and contained a portion of the Commonwealth's opening statement. The defendant excepted to the denial of his motion on the ground that the article may have tainted the testimony of the chief prosecution witness, Vasquez, because the reported portions of the opening statement outlined his expected testimony He specifically and emphatically stated that his exception was not based on possible prejudicial effect on the jury, who had been sequestered and would not therefore have had access to the article. The defendant declined the offer of the trial judge to poll the jury to ensure that they had not seen the article.

On appeal the defendant raises only the issue of possible prejudicial effect on the jury. Since he based his objection below on a different ground and specifically disavowed this ground of objection, there is technically no issue before us. *Commonwealth* v. *Flynn,* 362 Mass. 455, 472 (1972). *Commonwealth* v. *Gray,* 357 Mass. 771, 772 (1970). However, we have reviewed the record and find no prejudice to the defendant from this article. See *Commonwealth* v. *McLeod,* 367 Mass. 500, 501-502 (1975). On denying the defendant's motion for a mistrial, the trial judge offered defense counsel an opportunity to cross-examine Vasquez with respect to any influence the article may have had on his testimony, but counsel declined to do so when the time came.

3. *Motion to suppress identification.* After conducting a voir dire hearing on the admissibility of Vasquez's in-court identification of the defendant, the trial judge denied the defendant's motion to suppress and issued written findings and rulings of law. He found (1) that Vasquez had had ample opportunity to observe the defendant in the store to enable him to make an identification, (2) that the manner in which the photographs were shown to Vasquez was fair and nonsuggestive, and (3) that Vasquez's selec-

tion of the defendant's photograph was made entirely of his own volition.

The sole argument raised by the defendant is that he was arrested on Sunday, January 28, 1973, and that the showing of photographs to Vasquez on the morning of Monday, January 29, 1973, without the presence of defense counsel violated the defendant's rights under the Fifth and Fourteenth Amendments to the United States Constitution.

However, the record clearly indicates that the defendant was not arrested until the evening of Monday, January 29, 1973. We are at a loss to discern the basis for counsel's assertion that the defendant was arrested on Sunday. In any case, the date of arrest is irrelevant in this context, for we have previously held that the Sixth Amendment right to counsel does not extend to the showing of standard police identification photographs. *Commonwealth* v. *Roberts,* 362 Mass. 357, 367 (1972). *Commonwealth* v. *Gizicki,* 361 Mass. 889 (1972). *Commonwealth* v. *Ross,* 361 Mass. 665, 673-674 (1972), judgment vacated on other grounds, 410 U.S. 901 (1973). With respect to his Fourteenth Amendment claim, the defendant does not argue that the photographic showings were impermissibly suggestive, and there is nothing in the record to suggest that they were. *Commonwealth* v. *Gizicki, supra.* The record fully supports the rulings of the trial judge.

4. *Miranda warnings.* The defendant contends that certain statements made by him to Boston police immediately following his arrest in Rhode Island Hospital on January 29, 1973, were inadmissible because he was under the influence of medication and could not fully understand the warnings administered to him pursuant to *Miranda* v. *Arizona,* 384 U.S. 436 (1966). The defendant raises no issue with respect to whether the Miranda warnings were properly administered, and there is sufficient evidence to support the trial judge's findings that they were given to the defendant prior to his statements to the police.

The trial judge conducted a lengthy voir dire hearing on the admissibility of these statements. The evidence showed

that two Boston police officers, Detectives Kovalski and Cashman, went to the hospital on January 29, 1973, with warrants for the defendant's arrest. They entered the defendant's room and found him sitting on his bed with his left arm bandaged. Kovalski identified himself as a Boston police officer and asked the defendant if he were Ronald Johnson, which the defendant twice denied. Kovalski showed the defendant the photograph which Vasquez had identified and asked the defendant, "Is this you?" to which the defendant responded, "No." Kovalski then told the defendant that his sister was outside speaking with police officers at which point the defendant admitted that he was Ronald Johnson. Kovalski read the defendant the Miranda warnings and asked the defendant if he understood and was willing to talk about the case. The defendant replied in the affirmative.

Kovalski asked the defendant when he had come to the hospital, and the defendant told him he had come from Boston Saturday night. In response to further questions, the defendant said that he had come by car but had not driven himself. When Kovalski asked who had driven him to the hospital, the defendant stated that he would answer no further questions. The questioning was stopped at that point.

Dr. William Hazard, the attending physician at Rhode Island Hospital, testified during voir dire that the defendant received the following medication: an Empirin tablet and an injection of demerol on admission in the early morning hours of January 28, a local anesthetic during surgery later that morning about ten o'clock, and intravenous antibiotics. After surgery he prescribed either a codeine and aspirin compound or a darvon tablet every four hours which would be administered only at the patient's request. The hospital records did not indicate whether or not the defendant had asked for medication. Dr. Hazard testified that none of these drugs would have altered the defendant's capacity for rational judgment and understanding and that the defendant had at all times been able to communicate with him.

The defendant testified that he had had no trouble communicating with friends and relatives who had visited him at the hospital or with fellow patients prior to the arrival of the police. He said nothing to indicate that his powers of perception and understanding were in any way affected by medication.

We find no evidence to suggest that these statements were other than voluntary or that the defendant did not knowingly and intelligently waive his rights. See *Commonwealth* v. *Hosey*, 368 Mass. 571, 576-579 (1975); *Commonwealth* v. *Murray*, 359 Mass. 541, 545-546 (1971); *Commonwealth* v. *Johnson*, 3 Mass. App. Ct. 226, 230-231 (1975). The ruling of the trial judge that these statements were admissible was correct.

5. *Hospital records.*   The defendant contends that his hospital records were not admissible in evidence under G. L. c. 233, § 79. General Laws c. 233, § 79, as appearing in St. 1959, c. 200, provides that "[r]ecords kept by hospitals ... under section seventy of chapter one hundred and eleven shall be admissible, and records which the court finds are required to be kept by the laws of any other state ... by hospitals ... similarly conducted or operated ... may be admitted by the court, in its discretion, as evidence in the courts of the commonwealth so far as such records relate to the treatment and medical history of such cases and the court may, in its discretion, admit copies of such records, if certified by the persons in custody thereof to be true and complete ...."

The trial judge found that the defendant's Rhode Island Hospital records were records required to be kept by the law of Rhode Island, and we find no error. The Massachusetts law which requires the keeping of hospital records, G. L. c. 111, § 70, as amended through St. 1970, c. 614, provides that "[h]ospitals ... shall keep records of the treatment of the cases under their care and the medical history of the same."[1] A similar requirement is imposed by Rhode

---

[1] This section was amended by St. 1975, c. 210, which substituted the words "including the medical history and nurses' notes" for "and the medical history of the same."

Island. Pursuant to authority granted by R.I. Gen. Laws § 23-16-10, the Rhode Island Department of Health promulgated its regulation, Rules and Regulations for Licensing of Hospitals § 115.3 (July, 1974), which provides that "[a] medical record shall be established and maintained for every person treated on an inpatient, outpatient, (ambulatory) or emergency basis, in any unit of the hospital."

While the record is silent as to the judge's findings with respect to the law of Rhode Island, we are satisfied that these records were admissible under G. L. c. 233, § 79. The purpose of that statute is to ensure reliability of records without requiring a cumbersome authentication procedure to determine admissibility. These records were required to be kept by the law of Rhode Island and were certified by the supervisor of the hospital's medical records department.

While it would be preferable to have the basis for admission made a part of the record, we find no error in the admission of these hospital records.

6. The defendant raises several other assignments of error which are without merit. We have reviewed the entire record in this case and find no basis to exercise our powers under G. L. c. 278, § 33E, to order a new trial or to alter the jury's verdict which was fully supported by the evidence before them.

*Judgments affirmed.*