COMMONWEALTH vs. GEORGE E. CLARK.

Middlesex. March 6, 1979. — July 5, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Identification. Evidence*, Photograph. *Practice, Criminal*, Access to
photographs used in identification, Directed verdict, Capital case,
Challenge of jurors. *Due Process of Law*, Access to photographs used
in identification. *Jury and Jurors.*

There was no merit to a criminal defendant's contention that a photo-
graphic array shown to a witness was impermissibly suggestive in
that the defendant's photograph was one of two snapshots in a
group with eleven "mug shots." [396-402]
At a criminal trial, the judge did not err in admitting in evidence a
photograph selected from an array of photographs by a witness as
bearing a "striking resemblance" to a man he had questioned at a
hospital although there was conflicting testimony as to whether the
photograph was of the defendant. [398-402]
At a criminal trial, the judge did not err in denying the defendant's
motion for the production of photographs shown to witnesses for
the Commonwealth who were unable to identify the defendant.
[402-403]
At a murder trial, there was sufficient evidence, including evidence
that the defendant's fingerprints were found at the scene of the
crime and that they had been placed at the scene during the com-
mission of the crime, to warrant a finding that the defendant was
guilty of murder in the first degree. [403-406]

INDICTMENT found and returned in the Superior Court
on May 14, 1975.

The case was tried before *Nelson, J.*

*Willie J. Davis* for the defendant.

*William L. Pardee*, Assistant District Attorney, for the
Commonwealth.

ABRAMS, J. On December 20, 1972, Edward J. Donovan,
the manager of the My Way Lounge located in the Cam-
bridge Holiday Inn, was shot and killed by two male pa-

trons during an attempted armed robbery of the lounge. George E. Clark was arrested, indicted and, after a jury trial, convicted of the murder in the first degree of Donovan. Clark appeals pursuant to G. L. c. 278, §§ 33A-33G.

The defendant argues assignments of error concerning (1) the denial of his motion to suppress identification testimony; (2) the refusal of the court to require the Commonwealth to produce certain photographs shown to witnesses; and (3) the denial of his motion for a directed verdict. The defendant also seeks relief under G. L. c. 278, § 33E, asking that we reverse his conviction and order a new trial or, alternatively, that we reduce the verdict to accessory after the fact. We affirm the conviction and we decline to exercise our powers under G. L. c. 278, § 33E.

We summarize the evidence. Shortly after 11 P.M. on December 19, 1972, two men entered the My Way Lounge at the Holiday Inn located in Cambridge. Both men were black, and were between the ages of twenty-five and thirty-five. One of the men appeared to be slightly taller than the other.

The two men sat at the horseshoe-shaped bar, and the taller of the two ordered two bottles of Budweiser beer from the bartender, one Patricia Delong. Delong opened the bottles and placed one bottle in front of each of the men. She also placed a napkin and a glass in front of each man.

About forty-five minutes later, the same man asked Delong for two more Budweisers. Delong removed the first two bottles, which were empty, and placed them in a wastebasket located against the inside of the bar. She then served each man another bottle of Budweiser beer.

After the two men finished their second bottles of Budweiser, Delong removed the bottles and placed them in the same wastebasket. She then informed the men that the lounge would close shortly and asked if they wished to order another beer. Neither man placed an order.

A few minutes before 1 A.M. on December 20, Delong locked the liquor cabinets, washed off the top of the bar

and removed the money from the cash register. She placed the money in a small cashbox, walked to the end of the bar and handed the money to Edward Donovan, the manager. Delong then walked toward the kitchen area to leave for the night.

She had taken only a few steps when she was confronted by one of the black men who earlier had been sitting at the bar. He pointed a revolver at her and said something to the effect that "this is a holdup" or "put your hands up."

The second black man put a gun to Donovan's head and reached for the cashbox. Donovan said, "No, no way. You're not going to get it." Donovan then threw down the cashbox and reached for his own gun, which Donovan wore in a holster on his hip. Both men fired, and Donovan fell to the floor. His assailant then took a step backward and fired at Donovan three more times. Both of the black men then left the scene, leaving the cashbox on the floor.

One of the other customers then told everyone in the bar not to touch anything until the police arrived. The rescue squad arrived along with the police and Donovan was pronounced dead at the scene. An autopsy later revealed that Donovan died as a result of his gunshot wounds.

During the course of their investigation, police examined the contents of the bartender's wastebasket located on the inside of the bar. They discovered five empty Budweiser beer bottles in the basket.[1] These five bottles, along with some glasses, were removed and later checked for fingerprints.

The fingerprint examination revealed that the defendant's fingerprints appeared on two of the empty Budweiser beer bottles recovered from the bartender's wastebasket. The defendant's thumbprint was also found on one of the glasses taken from the lounge where the perpetrators had been seated.

---

[1] See note 14, infra.

At about 2 A.M. on December 20, three black men arrived in a gold-colored Buick automobile at the gatehouse guarding the entrance of the Chelsea Naval Hospital. The men told the security guard that one of them had been shot in the arm. The guard allowed the men to enter the grounds. The guard then returned to the gatehouse and informed his sergeant, one John Hunter, of the incident.

The sergeant followed the men to the hospital emergency entrance where he copied the license number of the Buick. He then went inside the hospital and questioned the two men who were not being treated.

In response to the sergeant's questions, the shorter of the two men gave his name as Irving Mallory and his address as 29 Wyoming Street.[2] However, the man said that he had forgotten to bring any identification with him.

The sergeant then left the emergency room and returned to the gatehouse to make out his report. Shortly thereafter, the two men who were not wounded also left the hospital grounds.

A hospital physician removed a bullet from the third member of the group and determined that the man was not seriously injured.[3] The man left the hospital the next morning.

The incident at the Chelsea Naval Hospital was reported to Cambridge police a few days later. The police were given the bullet taken from the wounded man. They found that the bullet had been fired from Donovan's gun.

Within three weeks, Cambridge police had procured a picture of the defendant from the defendant's wife. Police officers included this picture in a group of photographs shown to the sergeant who had questioned the men at the

_____

[2] Police later determined that the gold-colored Buick was registered to the defendant and that the defendant at one time lived at 29 Wyoming Street.

[3] At trial, the physician testified that the defendant was not the man whom he had treated.

hospital. The sergeant picked out the picture of the defendant as bearing a "striking resemblance" to the man who had given the name "Irving Mallory" at the hospital.

Police questioned the defendant on April 18, 1975. Clark initially denied ever having been in the Cambridge Holiday Inn. However, when police informed Clark that his fingerprints had been found at that location he said that he may have been in the Holiday Inn with his girl friend on one occasion. Later, Clark admitted to having been at the Holiday Inn earlier in the evening of December 19, 1972.

The defendant presented Andrei Clark as a witness.[4] Mrs. Clark denied having given Clark's photograph to police. However, she said that the person in the photograph had the same facial features as Clark, but that the hair and clothes were different.

The jury found Clark guilty of murder in the first degree. The judge sentenced him to life imprisonment. G. L. c. 265, § 2.

I. *Motion to Suppress Identification Testimony.*

Clark claims that the judge erred in denying a motion to suppress the identification testimony of John Hunter. Clark argued to the judge that Hunter's identification testimony should be suppressed because Hunter was unable to provide an unequivocal identification of the defendant. Clark further argued to the judge that a photograph which Hunter picked out of an array of photographs shown to him should be suppressed because the Commonwealth had not established that the photograph was a picture of the defendant.[5] On appeal, Clark

---

[4] Mrs. Clark was married to the defendant. However, she became legally separated from him on November 16, 1971, and her divorce from the defendant was pending at the time of trial.

[5] A police officer testified that the photograph which Hunter picked out was a photograph of Clark, given to police by Clark's wife. Clark's wife later denied giving the photograph to police. The resolution of the conflicting testimony is for the jury. See *Commonwealth* v. *Tabor*, 376 Mass. 811, 813 n.4 (1978); *Commonwealth* v. *Hoffer*, 375 Mass. 369, 379 (1978); *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978).

asserts that the testimony should have been suppressed because it resulted from a constitutionally impermissible pretrial photographic identification procedure.[6]

None of the defendant's arguments relating to Hunter's identification testimony is properly before us.[7] A defendant "is not permitted to raise an issue before the trial court on a specific ground, and then to present that issue to this court on a different ground." *Commonwealth v. Flynn*, 362 Mass. 455, 472 (1972). See *Commonwealth v. Johnson*, 371 Mass. 862, 867 (1977); *Commonwealth v. Lewis*, 346 Mass. 373, 383 (1963), cert. denied, 376 U.S. 933 (1964). Nonetheless, to avoid a "substantial risk of a miscarriage of justice," we have reviewed the record to determine whether any of the defendant's arguments has merit. *Commonwealth v. Lovett*, 374 Mass. 394, 403 (1978). See G. L. c. 278, § 33E. See also *Commonwealth v. Johnson, supra* at 867. We find no error in the denial of the defendant's motion to suppress.[8]

---

[6] The defendant's appellate counsel did not represent the defendant at trial.

[7] We also observe that the motion to suppress Hunter's identification testimony was made during trial. Rule 61 of the Rules of the Superior Court (1974), requires that such motions be made prior to trial "unless opportunity . . . did not exist or the defendant was not aware of the grounds for the motion." It is clear that defense counsel knew of the grounds for the motion and that he failed to make this motion promptly. Since we are deciding this issue solely under G. L. c. 278, § 33E, we need not decide whether the judge was required to entertain the defendant's motion at all.

[8] The defendant bears the burden of proving "by a preponderance of the evidence that the photographic identification was unnecessarily suggestive." *Commonwealth v. Venios, ante* 24, 29 (1979). Since the defendant did not argue to the judge that the photographic identification was unnecessarily suggestive, the judge made no finding as to this issue. However, the entire array of photographs which the defendant now challenges was admitted as an exhibit during trial, and it is a part of the record on appeal. Moreover, the facts surrounding the identification procedure are not in dispute and they provide a sufficient basis for our determination that no substantial risk of a miscarriage of justice has resulted from Hunter's identification of the defendant.

The facts relating to the identification testimony indi-
cate that during the early morning hours of December 20,
1972, Hunter was the sergeant on security duty at the
Chelsea Naval Hospital. After the gatehouse guard al-
lowed an automobile containing three men to enter the
grounds, the guard reported the incident to Hunter and
Hunter followed the vehicle to the hospital emergency
entrance. Hunter then entered the hospital and ques-
tioned two of the individuals who had arrived in the au-
tomobile. Hunter stated that he never saw or spoke with
the man who was being treated for the gunshot wound.

Hunter provided a detailed description of each of the
men whom he questioned, and stated that the shorter of
the two had given the name "Irving Mallory," and gave
an address of "29 Wyoming Street." Hunter also stated
that "Mallory" had subsequently made a telephone call,
and that Hunter was close enough to the man to overhear
the conversation. The man said, "Lewis Brown ha[s] been
shot" and "I think we're in big trouble."

Approximately three weeks after the incident, Hunter
went to the Cambridge police station where he was shown
an array of thirteen photographs. All of the photographs
were of black men of approximately the same age and
build. Eleven of the photographs were of the "mug shot"
variety, showing two views of the individual pictured.
The other two photographs were snapshots: one showed
a man standing upright; the other showed an individual
wearing a necktie.

Hunter picked out one of the double-view photographs
as showing an individual with the same hairstyle as one
of the men he had questioned at the hospital. Hunter
picked out the snapshot of the man wearing the necktie
as bearing a "striking resemblance" to the man who had
given the name "Irving Mallory" at the hospital. Accord-
ing to Hunter, he picked the snapshot because of the
resemblance to "the facial features of the . . . gentleman
in question."

On appeal, Clark bases his challenge to Hunter's identification testimony on the assertion that Hunter's identification was the product of a pretrial photographic identification procedure which was "unquestionably unduly suggestive." Specifically, Clark argues that the fact that Clark's photograph was one of two snapshots shown to the witness along with eleven "mug shots" unfairly attracted the witness's attention to Clark's photograph and "was conducive to irreparable mistaken identification since the suggestive photograph, once chosen, was unlikely to erase itself from the witness' mind."

The defendant relies primarily on *Simmons* v. *United States*, 390 U.S. 377 (1968), to support his claim. In *Simmons*, the Supreme Court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* at 384. We do not think that the photographic identification procedure after which Hunter "identified" the defendant is prohibited by *Simmons*.[9]

The defendant's argument that the photographic array was impermissibly suggestive rests solely on the fact that the defendant's photograph was one of two snapshots in a group with eleven "mug shots," since all thirteen photographs were of black males of roughly the same description. Clark's argument boils down to the assertion that any difference in the size, shape or type of photograph in

---

[9] The Commonwealth questions whether *Simmons* v. *United States*, 390 U.S. 377 (1968), is applicable to the circumstances of this case, since the witness testified "only" that he picked out the photograph as resembling "Mallory" and that the defendant resembled the man in the photograph. However, in response to a question by the assistant district attorney asking Hunter's "independent recollection of Mr. Mallory," Hunter also testified that "the shape of [the defendant's] facial features are similar to . . . the one that gave the name of Mr. Mallory." Thus, we think that the principles announced in *Simmons* may apply to Hunter's identification of the defendant.

the array is always inherently suggestive. We do not agree.

The difference in the photographs here in no way suggested to the witness the person that the police had under investigation. The defendant does not claim that the difference in photographs was used impermissibly to suggest to the witness which photograph was that of the suspect.[10] Rather, he suggests that the difference alone was impermissibly suggestive and thus both the photographic and the in-court testimony of Hunter must be suppressed.

"The difference between [the defendant's] photograph and the other mug shots would hardly suggest to an identifying witness that [the defendant] was more likely to be the culprit; nor did the photograph single out any distinguishing personal characteristics of defendant not possessed by the men in the other photographs." *United States* v. *Magnotti*, 454 F.2d 1140, 1142 (2d Cir. 1972) (witness shown array of seven "mug shots" and "a full-view photograph of the defendant"). Thus the difference in the photographs, taken alone, does not make the array impermissibly suggestive. *United States* v. *Sherry*, 318 A.2d 903, 904-905 (D.C. 1974) (single-view snapshot of defendant in array with eleven double-view photographs, all of similar white males, not unfairly suggestive). *United States* v. *Harrison*, 460 F.2d 270, 271 (2d Cir.), cert. denied, 409 U.S. 862 (1972). See *Whitt* v. *State*, 266 Ind. 211, 215-216 (1977); *State* v. *Cass*, 356 So. 2d 936, 942 (La. 1977). Cf. *Commonwealth* v. *Kostka*, 370 Mass. 516, 523-524 (1976); *United States* v. *Marchand*, 564 F.2d 983, 995 (2d Cir. 1977), cert. denied, 434 U.S. 1015 (1978); *United States* v. *Cunningham*, 423 F.2d 1269, 1271-1273 (4th Cir. 1970); *People* v. *Fox*, 65 App. Div. 2d 880, 881 (N.Y. 1978); *State* v. *Davis*, 294 N.C. 397, 405-406 (1978); *Commonwealth* v. *Wilcox*, 481 Pa. 284, 289-290 (1978).

---

[10] Nothing in the record supports any claim of suggestiveness in the manner in which the array was shown to the witness. Indeed, the defendant has not so argued.

The circumstances surrounding Hunter's identification of the defendant's photograph provide added support for the conclusion that Hunter's identification was not the product of an impermissibly suggestive procedure. Hunter testified that while his attention was drawn to the defendant's photograph because it was different from most of the others, he chose the photograph solely because of the man's facial characteristics. See *Commonwealth* v. *Mobley*, 369 Mass. 892, 894-895 (1976). Significantly, the defendant's photograph was not the only snapshot in the array, and Hunter *rejected* the other single-view snapshot. Compare *United States* v. *Sherry, supra* (array including defendant's photograph as the only single-view snapshot in array of twelve photographs not impermissibly suggestive); *United States* v. *Magnotti, supra* at 1141. Hunter's care in examining all of the photographs is also evidenced by the fact that he identified one of the double-view photographs as showing the hairstyle of the other man he had seen at the Chelsea Naval Hospital.

Further, at the time Hunter viewed the array of photographs, police had made no arrests in this case, which involved a homicide. Thus the police had little alternative than to resort to photographic identification.[11] See *Simmons* v. *United States, supra* at 384-385.

Finally, the defendant argues that in any event the photograph should not have been admitted as evidence. We think that "[t]he introduction of the photograph in evidence was permissible as an aid to the jury in matching the description given by the witness with the features of [the defendant]." *Commonwealth* v. *Locke*, 338 Mass. 682, 687 (1959) (witness testified that photograph of the defendant resembled "facial characteristics" of driver of getaway vehicle). See *Commonwealth* v. *Vitello*, 376

[11] The defendant has not claimed that any photograph of the defendant other than that actually shown to Hunter was available to the police in 1973.

Mass. 426, 460 n.29 (1978). Cf. *Commonwealth* v. *Hicks*,
377 Mass. 1, 7 (1979). See also *United States* v. *Malatesta*,
583 F.2d 748, 758 (5th Cir. 1978), modified on other
grounds on rehearing en banc, 590 F.2d 1379, cert. denied
sub nom. *Bertolotti* v. *United States*, 440 U.S. 962 (1979)
("The fact that an identification is less than positive does
not render it inadmissible"); *United States* v. *Eatherton*,
519 F.2d 603, 609 (1st Cir.), cert. denied, 423 U.S. 987
(1975). Moreover, since the photograph was the subject of
conflicting testimony it was clearly appropriate for the
judge to admit it as evidence for the jury's consideration.

Viewed in light of the totality of the circumstances, we
conclude that the pretrial photographic identification
procedure used by police in this case is not "so impermis-
sibly suggestive as to give rise to a very substantial likeli-
hood of irreparable misidentification." *Simmons, supra*
at 384. Accord, *Commonwealth* v. *Mobley, supra* at 895-
897. There was no error.

II. *Motion to Produce Photographs Shown to Witnesses.*

Clark maintains that his motion for the production of
photographs shown to or seen by witnesses for the Com-
monwealth who were unable to identify the defendant
should not have been denied. According to the defendant,
the judge's refusal to require the Commonwealth to pro-
duce these photographs following the defendant's general
pretrial motion for the production of exculpatory evi-
dence "prejudiced the Defendant's constitutionally guar-
anteed right to due process of law." See *United States* v.
*Agurs*, 427 U.S. 97 (1976); *Brady* v. *Maryland*, 373 U.S. 83
(1963). We do not agree.

During oral argument, the defendant conceded that the
judge properly denied the defendant's motion, made dur-
ing trial, for the production of the photographs shown to
the witnesses. The Commonwealth is not required to pro-
duce the photographs. See, e.g., *Commonwealth* v. *Brown*,
376 Mass. 156, 161-164 (1978); *Commonwealth* v. *Gibson*,
357 Mass. 45, 46-47, cert. denied, 400 U.S. 837 (1970);
*Commonwealth* v. *Clark*, 3 Mass. App. Ct. 481, 484-485

(1975). Instead, the defendant now limits his argument to the assertion that "the defendant had a right to know whether or not the photographs exhibited to the witnesses did in fact contain a photograph of George Clark."

Where a witness identifies a defendant during a pretrial photographic identification procedure after the witness has been unable to make an identification from another group of photographs, the defendant is entitled to know whether the defendant's photograph actually appeared in both sets of photographs.[12] *Commonwealth* v. *Clark, supra* at 485. See *Commonwealth* v. *Brown, supra* at 162-163. Presumably, such information would serve to aid the defendant in impeaching any identification made by that witness. Accord, *Commonwealth* v. *Dougan*, 377 Mass. 303, 316-317 (1979).

Here only Hunter identified the defendant. The only array shown to Hunter was available to the defendant and is an exhibit. To the extent that the defendant's argument is that other witnesses, who were unable to identify the defendant, may have bypassed the defendant's picture in the array, that argument is without merit. Those witnesses could neither identify the picture of the defendant, nor could they identify him at trial. Thus there is no error in the denial of the defendant's motion.

III. *Denial of the Motion for Directed Verdict.*

The defendant maintains that the denial of his motion for a directed verdict of acquittal, made at the close of the Commonwealth's case, was error. In reviewing the denial of a motion for directed verdict, we consider only the evidence introduced up to the time the Commonwealth rested its case. *Commonwealth* v. *Tabor*, 376 Mass. 811, 824 n.20 (1978). *Commonwealth* v. *Amazeen*, 375 Mass. 73, 79-80 (1978). *Commonwealth* v. *Kelley*, 370 Mass. 147, 150

---

[12] It is clear from the record that prior to trial defense counsel neither availed himself of the opportunity to view the photographs nor made a more specific request to the prosecutor for information relating to the presence or absence of the defendant's photograph in the police identification files.

(1976). The question is whether, considered in its light most favorable to the Commonwealth, the evidence presented by the Commonwealth "is sufficient so that the jury 'might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt.' " *Commonwealth* v. *Clifford*, 374 Mass. 293, 296 (1978), quoting from *Commonwealth* v. *Vellucci*, 284 Mass. 443, 445 (1933). See *Commonwealth* v. *Vitello*, 376 Mass. 426, 460-461 (1978). Viewed in this light, the facts set forth in the summary of facts, *supra*, provide sufficient evidence from which the jury could find the defendant guilty of murder in the first degree.

The defendant argues that only the fingerprints found on the two empty Budweiser beer bottles recovered from the bar's wastebasket place him at the location on the night of the murder.[13] According to the defendant, he was in the motel restaurant, but not the bar, on the evening in question. The defendant asserts that the bottles on which his fingerprints appeared could have been brought into the bar and placed in the wastebasket by a restaurant waitress. Hence the defendant concludes that the Commonwealth has not presented sufficient evidence to warrant submitting the case to the jury.

In *Commonwealth* v. *LaCorte*, 373 Mass. 700 (1977), we recognized that in most jurisdictions the mere fact that a fingerprint is found at the scene of a crime is insufficient to warrant submitting the case to the jury. There must also be "further evidence linking the defendant to the crime . . . [enabling] the prosecution to establish beyond a reasonable doubt that the fingerprints in fact were placed at the scene during the commission of the crime." *Id.* at 703.

---

[13] The defendant does not deny that the fingerprints found on the bottles belonged to him.

Here, witnesses testified that the two men who attempted the armed robbery resulting in Donovan's death were the only black patrons in the bar that evening. The bartender testified that she served four bottles of Budweiser beer to the two men involved in the killing, and that each of the men drank two bottles of beer. The bartender further testified that after the men finished their bottles of beer, she placed each of the four bottles in the wastebasket under the bar.

Immediately after the killing, police recovered the bottles from the wastebasket. The uncontradicted testimony of the police officers establishes that there were exactly five empty Budweiser beer bottles in the wastebasket.[14] The defendant's fingerprints were later found on two of these bottles, as well as on a glass found at the bar.

From this evidence alone, the jury could reasonably infer not only that the defendant was at the motel, but also that the defendant was in the bar, and that he was one of the two men to whom the bartender had served the bottles of beer. Since the wastebasket contained only one empty Budweiser beer bottle not served to individuals involved in the killing, the jury were entitled to consider whether an individual whose fingerprints appeared on two of the Budweiser bottles found in the wastebasket as well as on a glass found at the bar was one of the men involved in the killing. See *Commonwealth* v. *Jones*, 360 Mass. 498, 501 n.2 (1971); *McNeil* v. *State*, 227 Md. 298, 300 (1961) ("It is generally recognized that fingerprint

---

[14] The defendant makes much of the fact that a police photograph revealed a sixth empty Budweiser beer bottle with a ripped label sitting on the bar, some distance away from both the location of the wastebasket and the place where the two men were seated. However, the bartender testified that she placed all four of the bottles touched by the perpetrators of the crime in the wastebasket and that she had not left one of them on the bar. She also denied that a bottle with a torn label was served to the men. Police testified that only five bottles were removed from the wastebasket and that these five bottles were all taken to police headquarters. The issue of their credibility is for the jury. See, e.g., *Commonwealth* v. *Hoffer*, 375 Mass. 369, 377 (1978).

evidence found at the scene of a crime must be coupled with evidence of other circumstances tending to reasonably exclude the hypothesis that the print was impressed at a time other than that of the crime"); *Lawless* v. *State*, 3 Md. App. 652, 659 (1967). See also *In re M.M.J.*, 341 A.2d 421 (D.C. 1975). Cf. *Hack* v. *Commonwealth*, 433 S.W.2d 877, 878-879 (Ky. 1968). See generally A. Moenssens & F. Inbau, Scientific Evidence in Criminal Cases 374-379 (2d ed. 1978). Thus the fingerprint evidence in this case, taken alone, satisfies the requirements of the rule to which we alluded in *Commonwealth* v. *LaCorte*, *supra* at 703. When combined with the other evidence presented by the Commonwealth, including Hunter's identification of the defendant as having a "striking resemblance" to the man at the Chelsea Naval Hospital, there was sufficient evidence from which the jury could find the defendant guilty of murder in the first degree. See *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 407-408 (1978); *Commonwealth* v. *Hoffer*, 375 Mass. 369, 377 (1978); *Commonwealth* v. *Clifford*, *supra* at 296. See generally *United States* v. *Roberts*, 481 F.2d 892, 893-894 (5th Cir. 1973).[15]

IV. *Relief Pursuant to G. L. c. 278, § 33E.*

The defendant asks that we exercise our authority pursuant to G. L. c. 278, § 33E, to order a new trial. In the alternative, he asks that we "enter . . . an order reducing the verdict to that of accessory after the fact."

The defendant's arguments for a new trial merely repeat his arguments discussed earlier. We have found no

---

[15] The defendant's reliance on *Commonwealth* v. *Fancy*, 349 Mass. 196 (1965), and *Commonwealth* v. *Altenhaus*, 317 Mass. 270 (1944), is misplaced. Unlike the situation in *Fancy* and *Altenhaus*, here the evidence presented by the Commonwealth directly supported the inference that the defendant was one of the two men involved in the killing. "While the jury could have disbelieved the testimony of . . . [the] prosecution witnesses they were not required to do so. The judge properly denied the defendant's motions for a directed verdict." *Commonwealth* v. *Clifford*, 374 Mass. 293, 297 (1978).

error and decline to order a new trial. See *Commonwealth* v. *Haywood*, 375 Mass. 755, 771 (1979). Cf. *Commonwealth* v. *Brown*, 376 Mass. 156, 166-168 (1978).

The defendant also asks that we order the reduction of the verdict to that of accessory after the fact, claiming that the fingerprint evidence placing the defendant at the scene of the killing is "inconclusive." The Commonwealth argues that the jury's verdict was "fully supported by the weight of the evidence and the law." The Commonwealth also questions whether our authority to direct a verdict "of a lesser degree of guilt" may be construed to authorize us to order the reduction of a verdict of murder in the first degree to that of accessory after the fact, or whether our authority is limited to consideration of lesser included offenses. Cf. *Commonwealth* v. *Rutledge*, 356 Mass. 499, 503 (1969).[16]

We need not consider the defendant's novel assertion that under G. L. c. 278, § 33E, we have the power to direct the entry of a verdict of guilt for a crime not charged by indictment and not submitted to a jury. We have reviewed the entire case on the law and the evidence and we find no reason to reduce the verdict to a lesser degree of guilt.[17]

*Judgment affirmed.*

[16] The Commonwealth correctly notes that there is a substantial difference between the crime of murder and the crime of accessory after the fact to murder. See G. L. c. 274, § 4. Cf. *Commonwealth* v. *Berryman*, 359 Mass. 127, 129 (1971) ("one cannot be both a principal in a crime and an accessory after the fact to the same crime").

[17] This case was pending on direct appeal at the time our decision in *Commonwealth* v. *Soares*, 377 Mass. 461 (1979), was announced. Therefore, while the parties have neither briefed nor argued the issue, our review of the case on the law and the evidence has included an examination of the propriety of the prosecutor's exercise of peremptory challenges. See *id.* at 493 n.38.

The record reveals that, as in *Soares*, the defendant here is black and the victim was white. None of the sixteen jurors ultimately seated in this case was black.

During the process of jury selection, the prosecutor exercised one peremptory challenge to remove the only black person, a woman, who was among the group of fifty potential jurors. At the bench, defense

counsel objected to the prosecutor's use of the peremptory challenge to remove the black juror, and the prosecutor denied challenging the juror on the basis of race.

Since the trial of this case preceded the announcement of *Soares,* the judge, of course, made no explicit findings as to this issue. However, the judge did observe that "I have no facts nor evidence to suggest that he [the prosecutor] is making any purposeful challenge based upon race or sex." Thereafter, the prosecutor also responded to the defendant's objection by pointing out that he had already used nine peremptory challenges to remove white potential jurors, and the prosecutor asserted that "I have three challenges left; and I am being very careful about my challenges right now, and giving much thought as to the background of the individual, more than anything else." (The record contains no information as to the juror's background.) There is no error. Compare *Commonwealth* v. *Soares, supra* at 473 n.8, 487-488.