COMMONWEALTH vs. ELVIN A. MAYO, JR.

Middlesex.    September 19, 1985. — December 12, 1985.

Present: BROWN, KAPLAN, & PERRETTA, JJ.

*Identification. Practice, Criminal,* Mistrial, Fair trial. *Evidence,* Other offense.

The fact that the defendant's photograph was included in successive arrays
    shown to a rape victim did not render the identification procedure sugges-
    tive or require suppression of the victim's in-court or out-of-court iden-
    tifications of the defendant, where the victim had had a good opportunity
    to observe her assailant at the time of the attack, where the photographs
    of other individuals were also repeated in the arrays, and where there
    were investigatory reasons for the repetition of the defendant's photo-
    graphs. [216-218]
At the trial of a rape case, a reference to outstanding warrants for the
    defendant's arrest in a police officer's testimony did not require a mistrial
    where the judge promptly gave curative instructions to the jury, and
    where the officer's remarks did not remotely touch upon the key issue
    at trial, identification. [218-220]
There was no merit to a criminal defendant's contention that the cumulative
    prejudicial effect of the admission of certain evidence deprived him of
    a fair trial. [220]

INDICTMENT found and returned in the Superior Court De-
partment on July 19, 1983.

A motion to suppress evidence was heard by *Edith W. Fine,*
J., and the case was tried before *Robert A. Mulligan,* J.

The case was submitted on briefs.

*John C. McBride* for the defendant.

*Scott Harshbarger,* District Attorney, & *Karen J. Kepler,*
Assistant District Attorney, for the Commonwealth.

PERRETTA, J.  Following a jury trial in the Superior Court,
the defendant was convicted of rape. See G. L. c. 265, § 22.
He raises three questions on appeal: (1) whether the victim's
out-of-court and in-court identifications of him should have

been suppressed where there was a repetition of his picture in four, perhaps five, successive photographic arrays; (2) whether statements heard by the jury concerning New Hampshire arrest warrants for the defendant were so prejudicial as to require a mistrial; and (3) whether the verdict is tainted by "cumulative prejudice." We affirm.

1. *The Out-of-Court Indentifications.*

The defendant makes no argument that the judge's subsidiary findings are not warranted by the evidence; rather, he challenges the ultimate finding and ruling and argues that the "photographic identification procedures were so suggestive as to give rise to a very substantial likelihood of irreparable misidentification." We, therefore, recite the facts as found by the judge, noting in any event that they are well supported by the evidence. See *Commonwealth* v. *Moon,* 380 Mass. 751, 756 (1980).

About 4:30 A.M., on July 20, 1980, the victim, who has extensive training and experience as an artist, including portraiture, was raped on her bed in her apartment. Her window was open, and there was a substantial amount of light entering her room from artificial illumination in the vicinity. The victim was able to observe her assailant throughout the attack, which lasted about fifteen minutes. During that time the victim remained calm, and she "purposefully focused her attention" on her assailant's facial and other features.

When the asailant left her apartment, the victim called the police. Within about a half an hour of the crime, she gave the police a detailed description of the assailant's clothing, voice, size, and facial features. She described him as a black male, about five feet, ten to eleven inches, tall, one hundred and sixty-five pounds, good muscle tone, and large biceps. His hair was close-cropped, and he had a scraggly beard and hair in the center of his chin. His eyes were deep-set and bloodshot, his eyebrows thick, and he had furrows on his forehead. She described his nostrils as wide and his ears as flat. She was also able to describe his shirt in detail.[1]

---

[1] The defendant is approximately six feet, three inches, tall and was twenty-eight years of age at the time of the rape. When the victim was asked at

a. *Array of July 20, 1980.* That afternoon the victim went to the police station where she was shown two books with photographs of black and white males and females. The victim made no identification on this date, and the police are unable to state which photographs were in the books shown to the victim. The victim then worked with a police officer on the peparation of a composite drawing.

b. *Array of July 22, 1980.* On or about this date, the victim returned to the police station to view the finished composite. She was somewhat dissatisfied with the composite,[2] so she prepared her own drawing and gave it to the police. That drawing has been lost.

At this time, the victim was shown an array of between eight to sixteen pictures of black males. Photographs of the defendant and one Mark Mullins were included in this array. The victim did not make a positive identification. Instead, she stated that the photograph of Mulllins looked very much like her assailant, but she could be only sixty percent certain; she might be more certain if Mullins' picture depicted a slimmer person.[3] As to the defendant's photograph, the victim thought that it could be her attacker except that in the photograph the person depicted was heavier than her assailant.

c. *Array of September 5, 1980.* A mug book containing photographs of black and white males and females, including one of the defendant, was shown to the victim. She looked through the book, noted one in the middle, and looked through the remainder. The photograph which she noted was of the

---

the hearing on the motion to suppress to observe the defendant and estimate his height and age, she described him to be about five feet, eleven inches, tall and about forty years old.

[2] The judge found that the composite "bears only a gross resemblance" to the defendant.

[3] On September 4, 1980, the victim called the police station and reported that she had seen a man in her neighborhood who could be her assailant. A confrontation was then arranged between the victim and the man, who was in fact Mullins. During the confrontation, the victim observed Mullins closely and stated that he definitely was not her assailant, even though some of their features were similar.

defendant, and it was the same picture of him that she had seen before. She did not, however, remember that she had seen the photograph earlier. She stated that she was eighty-five percent certain that this photograph depicted her assailant.

d. *Array of May 6, 1981.* In May of 1981, the victim reported to the police that she was struck by a resemblance between her assailant and a ten year old girl who had visited the victim's daughter in her home. The child was the defendant's daughter and lived around the corner from the victim.

On May 6, 1981, the victim was again shown photographs, twelve, which included a more recent picture of the defendant as well as pictures of at least two others (including Mullins) who had been included in the earlier array. The defendant's picture, however, was different from all the others in the array in that the other pictures had placards with printing on them.[4] In this more recent picture of the defendant, he appeared slimmer, and the victim made a positive identification of him as her assailant.

e. *Array of June 10, 1983.* In June, 1981, the defendant had been in court on the present charges, but for a large portion of the time between that appearance and the proceedings on the 1983 indictment, the defendant was in default. He was apprehended in New Hampshire in March of 1983, and at that time his picture was taken by the police in New Hampshire.

On June 10, 1983, the victim was again shown an array of twelve photographs. This array was identical to that shown to her on May 6, 1981, except that the most recent picture of the defendant replaced the photograph of him shown to her on that occasion. Again, the victim positively identified the picture of the defendant.

As to the 1980 and 1981 arrays, the judge found that the police said and did nothing, suggestive or otherwise, to draw the victim's attention to the defendant's picture. The victim was never shown a single photograph of the defendant. The judge also found that the defendant's photographs shown on

---

[4] The judge found that this difference was not "significant" and that the "array was a fair" one.

September 5, 1980 (c above), and May 6, 1981 (d above), "were very different in appearance" and that the defendant "appears thinner in the photographs included in the array of June 10, 1983."

We are mindful of the "danger of misidentification" where a defendant's photograph is included in successive arrays shown to a witness. *Simmons* v. *United States,* 390 U.S. 377, 383 (1968), quoted and discussed in *Commonwealth* v. *Paszko,* 391 Mass. 164, 169 (1984). However, although the showing of numerous arrays is a significant fact, it is by no means controlling in determining whether the resulting identification must be suppressed. *Id.* at 169-170, and cases therein collected. Rather, the question is "whether, in the totality of the circumstances, the police have procured the identification by practices so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons* v. *United States,* 390 U.S. 377, 384 (1968). *Commonwealth* v. *Clark,* 378 Mass. 392, 399 (1979). In essence, the reviewing court applies a test of fairness which focuses on the reasonableness of the police procedures in terms of avoidable prejudice . . . [citations omitted]." *Commonwealth* v. *Vasquez,* 11 Mass. App. Ct. 261, 264-265 (1981).

In applying the appropriate test to the present circumstances, we first focus on the array of July 22, rather than that of July 20, because it is not known whether the defendant's photograph was even included in the first array. At the second array, the victim equivocated between the pictures of Mullins and the defendant. She leaned toward Mullins until September 4, 1980, when she confronted and then rejected Mullins as a suspect. (See note 3, *supra.*) The next day, when viewing an array for the third time, she was more inclined towards the photograph of the defendant, perhaps because she had positively rejected Mullins. She still made no positive identification of the defendant, although she was eighty-five percent certain that it was he. Her hesitation on September 5, 1980, was consistent with her reluctance of July 22, 1980, because on both occasions she viewed the same picture of the defendant (she was unaware of this fact on September 5) in which he appeared to her heavier

than her assailant. See *Commonwealth* v. *Paszko,* 391 Mass. at 171 ("[The witnesses] were consistent in refraining from positively identifying the defendant at both arrays, while maintaining that his photograph was the one most representative of the man they had seen. Their adherence to their reservations at the second array 'indicate[s] that "the police conduct was without significant effect." ' *Commonwealth* v. *Correia,* 381 Mass. 65, 79 [1980], quoting *United States* v. *Eatherton,* [519 F. 2d 603,] 609 [1st Cir. 1975]").[5]

It was on May 6, 1981, when the victim was shown an array including a more recent picture of the defendant that she made a positive identification. Of the twelve pictures in the array, the defendant's photograph is the only one in which a placard with printing does not appear. The defendant places great emphasis on that fact and argues that the judge was in error in finding this difference to be without "significance" and the array to be "fair." However, it must be recalled that the defendant's appearance depicted in the more recent photograph was very different from that studied by the victim on September 5, 1980. As found by the judge, "In this photograph [May 6, 1981] defendant appeared slimmer." Again, the police neither said nor did anything to attract the victim's attention to a particular photograph, see note 5, *supra,* and the victim's selection of the "thinner" appearing defendant is consistent with her earlier equivocation. We will not say that the victim's identification of the defendant was likely due to the absence of a placard from his picture. " 'The difference between [the defendant's] photograph and the other mug shots would hardly suggest to an identifying witness that [the defendant] was more likely to be the culprit; nor did the photograph single out any distinguishing personal characteristics of defendant not possessed by the men in the other photographs.' *United States* v. *Magnotti,* 454 F.2d 1140, 1142 (2d Cir. 1972)." *Commonwealth* v. *Clark,* 378 Mass. at 400.

---

[5] The judge found that the police said and did nothing, suggestive or otherwise, to draw the victim's attention to the defendant's picture during her viewing of any of the arrays.

Because of the victim's positive identification of the defendant on May 6, 1981, her subsequent identification from the final 1983 array "became of little significance." *Commonwealth v. LaPierre,* 10 Mass. App. Ct. 641, 644 (1980). Bearing in mind the victim's composure during her attack, the length of time she observed her assailant and the lighting conditions, her professional training as an artist, the facts that photographs of other individuals were also repeated in the arrays and that there were investigatory reasons for the repetition of the defendant's picture (the victim's rejection of Mullins and the defendant's weight loss), we are satisfied that the judge did not err in concluding that the "identification was the product of the victim's own recollection without inducement or reinforcement by impermissible suggestions." *Commonwealth v. Vasquez,* 11 Mass. App. Ct. at 266.

2. *The Motion for Mistrial.*

That there had been outstanding arrest warrants for the defendant was brought to the attention of the jury by a New Hampshire police officer in testifying to the circumstances of the defendant's apprehension. The Commonwealth does not argue that the testimony was admissible. See *Commonwealth v. Tuitt,* 393 Mass. 801, 809 (1985), quoting from *Commonwealth v. Gibson,* 357 Mass. 45, 48, cert. denied, 400 U.S. 837 (1970). Such testimony could improperly inform the jury of criminal activity by the defendant unrelated to the charges under consideration.

Upon hearing the testimony, the defendant immediately approached the bench and requested a mistrial, which was denied. However, the judge stated that he was going to give a curative instruction. The defendant did not object to such an instruction, but neither did he acquiesce in it, stating that "once you do that, you now highlight those warrants." The judge then put the question to the defendant: the motion for a mistrial was denied, did he or did he not want an instruction. The defendant's position, as we see it, was to want the instruction *and* the claim on any appeal that might ensue that no instruction could cure the error: "I leave that to your discretion. The relief I

wanted has been denied." The judge then forcefully instructed the jury to disregard the testimony.[6]

Whether to declare a mistrial is a matter within the judge's discretion. See *Commonwealth* v. *Hoffer*, 375 Mass. 369, 372-373 (1978); *Commonwealth* v. *Simmonds*, 386 Mass. 234, 241 (1982). The defendant claims that the judge here abused his discretion because no instruction could cure the prejudicial effect of the officer's testimony. No argument is made (nor could it be) that either the timing or the substance of the instruction was in any way deficient. See *Commonwealth* v. *Crehan*, 345 Mass. 609, 613 (1963); *Commonwealth* v. *Gibson*, 357 Mass. at 49, as examples of the established principle that immediate and forceful curative instructions can be sufficient to offset prejudice on the basis that jurors may be expected to follow instructions.

In concluding that the judge did not abuse his discretion, we have in mind that the officer's remark did not remotely touch upon the key issue at trial, identification, the testimony was a fleeting reference to a matter that was not of an inflammatory nature, and in the context of the officer's testimony, the "comment is an obscure one."[7] *Commonwealth* v. *Simmonds*, 386 Mass. at 241, in reference to testimony described at 240 & n.1.

---

[6] "[Y]ou just heard the witness testify to warrants, plural. The witness mentioned there was a warrant from the State of New Hampshire. That is not evidence in this case. And I instruct you, emphatically, to disregard that. You shall draw no inference, adverse to the defendant, by virtue of the fact that there may have or that this witness may have thought there was a warrant from the State of New Hampshire. I cannot instruct you emphatically enough, to disregard that. This is a Massachusetts case. I instruct you to put that out of your mind. It is not evidence in the case. It has been stricken." In his final instructions to the jury, with which the defendant was "satisfied," the judge made no reference to the testimony which he had struck.

[7] The prosecutor asked, and the officer answered:

"Q. When you saw Mr. Mayo at that railroad crossing, did that trigger any response by you?

"A. I recognized that that was Mr. Mayo and I also knew, at that point, that there were warrants for his arrest.

"Q. From where?

"A. Massachusetts and New Hampshire."

Viewing these circumstances in conjunction with the immediate and forceful instruction, "we are not convinced that . . . [the officer's statement] 'could have appreciably influenced the jury or tainted their verdict.' *Commonwealth* v. *Vanetzian,* 350 Mass. 491, 495 (1966). *Commonwealth* v. *Billings,* 6 Mass. App. Ct. 884 (1978)." *Commonwealth* v. *Simmonds,* 386 Mass. at 241.

3. *Cumulative Prejudice.*

The defendant next argues that he was denied a fair trial by reason of the admission of certain evidence in three instances which, when considered cumulatively, resulted in prejudice to such a degree as to require a new trial. He cites first testimony concerning the New Hampshire warrants. We have disposed of the claim of prejudice on this point, and we repeat only that the testimony was struck from evidence. Compare *ibid.*

As to evidence of the defendant's flight, the trial judge properly admitted the evidence as consciousness of guilt. Respecting the defendant's preference, the judge did not give a contemporaneous limiting instruction but delayed discussion of the matter until his final charge. No objection to the final charge was lodged, and the defendant does not now argue that the instructions were not in compliance with *Commonwealth* v. *Toney,* 385 Mass. 575, 585 (1982).

The defendant cannot complain that he was harmed by evidence of the fact that his wife had obtained an order restraining him from entering their home. Such evidence was offered by the defendant as part of his alibi defense, and the Commonwealth had the right to pursue the matter in the manner that it did. See *Commonwealth* v. *Atkins,* 386 Mass. 593, 605 (1982) ("A conscious, tactical choice by experienced defense counsel cannot now be converted into a claim of error").

*Judgment affirmed.*