COMMONWEALTH *vs.* MICHAEL V. LACORTE.

Suffolk.    October 4, 1977. — November 18, 1977.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, LIACOS, & ABRAMS, JJ.

*Evidence,* Fingerprints; Relevancy and materiality; Opinion: expert; Cross-examination.    *Practice, Criminal,* Argument by prosecutor.

At a trial in which there was abundant evidence linking the defendant to a murder committed in an apartment, a coffee cup found there immediately after and bearing his fingerprints was properly admitted in evidence, notwithstanding the absence of proof that the fingerprint was placed on the cup during the commission of the crime. [702-703]

Uncontroverted testimony from a police officer who had taken the defendant's fingerprints on a standard fingerprint card at the time of his arrest was properly admitted at his murder trial on the officer's identifying the defendant and stating that the proffered card was the one used in the fingerprinting, notwithstanding the absence of an accounting of the custody of the card between the arrest date and the trial date. [703-704]

At a murder trial, testimony of the Commonwealth's expert that a fingerprint on a coffee cup was "identical" with a finger of the defendant was not erroneously admitted as an expression of an opinion as to an ultimate fact for the jury. [705]

On cross-examination of prosecution witnesses at a murder trial, there was no error in excluding, following testimony about certain photographs admitted as exhibits, further testimony about them from a witness who had not been present when they were taken [705-706]; there was no error in excluding, as to a witness who had been extensively cross-examined as to his drug addiction at the time the defendant reenacted the crime, testimony concerning the witness's entry into an addiction center five days after the reenactment [706]; and there was no error in excluding questions to the patrolman who had discovered the victim's body as to whether he "had some information" about a woman who may have been present at the scene prior to the patrolman's arrival there [706-707].

The prosecutor's closing argument at a murder trial was not improper by reason of his asking the jury to act with courage. [707]

INDICTMENT found and returned in the Superior Court on December 16, 1974.

The case was tried before *Roy,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*John C. McBride* for the defendant.

*William J. Doyle*, Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J. The defendant Michael V. LaCorte (LaCorte) was indicted for murder in the first degree in connection with the death of Richard White in White's Boston apartment on May 29, 1974. After a five-day trial in the Superior Court, a jury found LaCorte guilty of murder in the second degree, and the judge sentenced him to life imprisonment. The defendant's assignments of error are here pursuant to G. L. c. 278, §§ 33A-33G, as amended. We conclude that there was no error.

Responding to a call from a neighbor, Boston police officers entered White's Marlborough Street apartment at approximately 6:05 A.M. and found White dead on the floor, bleeding from multiple stab wounds, a scarf tied around his neck like a noose. The jury were warranted in finding the following facts based on the Commonwealth's evidence. LaCorte had been with White on the night in question. He was seen in a restaurant with White about 11 P.M., and a third man was present with them. LaCorte and the unidentified man left together, but were seen with White again outside the restaurant about 1:25 A.M. At that time, the men seemed to be arguing. White was trying to walk away from the others, but LaCorte kept tugging at White's jacket and led him in another direction, saying, "Come on here, come on this way." About 6 A.M. a neighbor in an apartment adjacent to White's was awakened by loud screaming. Looking out her window, she saw two men running from White's building accompanied by a woman. In White's apartment, police found two cardboard coffee cups, one of which bore fingerprints which, in the opinion of the Commonwealth's expert witness, were "identical" to prints taken from LaCorte at the time of his arrest. Approximately four months later, in October, 1974, LaCorte

bragged to a group of friends about crimes he had committed in the past, including a murder — which he re-enacted for them. He related how he and a friend had "roundhoused" a Marlborough Street man who had "ripped us off." He illustrated his story by standing up one of his listeners, spinning him around, and pretending to stab him repeatedly at each turn. LaCorte told his friends — two of whom testified at trial — that his victim had fallen through a glass window during the struggle. Police found a broken window in White's apartment, and tests revealed that pieces of the broken glass were stained with blood.

1. The defendant argues that the cardboard cup bearing his fingerprint should have been excluded at trial because the prosecution failed to establish that the fingerprint was placed thereon in the apartment during the commission of the crime. This foundation, the defendant argues, is necessary to eliminate the possibility that LaCorte may have left the fingerprint during a previous visit to the apartment unrelated to the crime. Without it, he seems to argue, the evidence is irrelevant. We disagree. Certainly fingerprints found in the apartment of the victim immediately after the homicide have some tendency to prove the identity of the killer. It is this rational tendency to prove an issue in the case that makes the cup relevant and, subject to other rules, admissible. *Commonwealth* v. *Ross,* 361 Mass. 665, 679-680 (1972), judgment vacated, 410 U.S. 901, aff'd on rehearing, 363 Mass. 665, cert. denied, 414 U.S. 1080 (1973). *Commonwealth* v. *Durkin,* 257 Mass. 426, 427-428 (1926). The defendant's argument goes only to the weight of the evidence, not to its admissibility, and it is for the jury to determine — after listening to cross-examination and the closing arguments of counsel — what significance, if any, they will attach to the discovery of the defendant's fingerprints at the scene of the crime.[1] See *United States* v. *Kahaner,* 317 F.2d 459, 471-

---

[1] Since the defendant may have been in White's apartment on other occasions, the defendant might have been entitled to a limiting instruction emphasizing that the fingerprints were admitted in evidence to

472 (2d Cir. 1963); 1 J. Wigmore, Evidence § 29, at 411 (3d ed. 1940).

That is not to say, of course, that the mere discovery of the defendant's fingerprints at the scene of the crime, without further evidence linking the defendant to the crime, would be sufficient identification to support a conviction. Courts universally consider the fingerprint comparison to be an adequate and reliable method of identification. 2 J. Wigmore, Evidence § 414, at 390 (3d ed. 1940). See, e.g., *Commonwealth* v. *Bartolini,* 299 Mass. 503, 513, cert. denied, 304 U.S. 565 (1938). Moreover, when the prosecution can establish that fingerprints found at the scene of the crime could have been impressed only during the commission of the crime, fingerprint evidence pointing to the defendant almost certainly will support a conviction. See *Commonwealth* v. *Jones,* 360 Mass. 498, 501 n.2 (1971); *State* v. *Miller,* 49 Ohio St. 2d 198 (1977). Nevertheless, when fingerprints constitute the only identification evidence, most jurisdictions require the prosecution to establish beyond a reasonable doubt that the fingerprints in fact were placed at the scene during the commission of the crime. E.g., *United States* v. *Corso,* 439 F.2d 956, 957 (4th Cir. 1971); *State* v. *Mayell,* 163 Conn. 419, 426 (1972); Annot., 28 A.L.R.2d 1115, 1155-1157 (1953). But cf. *Borum* v. *United States,* 380 F.2d 595, 598-602 (D.C. Cir. 1967) (Burger, J., dissenting), cited with approval in *Commonwealth* v. *Jones, supra.* We need not reach this question because in this case the prosecutor introduced abundant evidence — including the defendant's own admissions — linking him to the murder in question.

2. Defense counsel argues that a standard fingerprint card, kept as an arrest record by the Boston police department, was not adequately authenticated as one bearing the

show only that the defendant was present there at some time. However, because of other circumstantial evidence in this case, the judge might well have ruled that the defendant was not entitled to such an instruction. In any event, the question is not before us, because the defendant requested no such instruction.

prints of the defendant and thus could not furnish a relevant standard against which the expert witness could compare the fingerprint found in White's apartment. We disagree. The Commonwealth offered the card through the police officer who fingerprinted LaCorte at the time of the arrest. The officer testified that on October 29, 1974, he took the fingerprints of a person — whom he identified in court as the defendant — and recorded them, together with that person's photograph and signature, on a standard fingerprint card. Defense counsel appears to have conceded at trial that the photograph and signature were genuine.

The officer identified the card offered by the prosecutor as the card on which he had taken LaCorte's fingerprints, and the judge received the card in evidence as an exhibit. The prosecutor made no attempt to account for the custody of the fingerprint card between the date of arrest and the date of the trial. The defendant argues that this constitutes a gap in the evidence fatal to the authentication and that the judge erred in admitting the card as a genuine set of LaCorte's fingerprints. This argument misperceives the nature of the authentication requirement.

In order to be material, a thing offered in evidence genuinely must be what its proponent represents it to be. Its authenticity must be stipulated or else proved like any other fact. "Such proof of authenticity usually takes the form of testimony of a qualified witness either (1) that the thing is what its proponent represents it to be, or (2) that circumstances exist which imply that the thing is what its proponent represents it to be." W.B. Leach & P.J. Liacos, Massachusetts Evidence 265 (4th ed. 1967). In this case there was testimony from the officer who had taken the defendant's fingerprints that the proffered card was the one used in the fingerprinting. In light of such direct identification of the card and its contents, uncontroverted in cross-examination or by any other evidence, there was no necessity to authenticate the card by circumstantial proof, such as showing the chain of custody of the card since the fingerprints were taken.

3. The Commonwealth's expert testified that he considered one of the fingerprints on the coffee cup "to be identical with the left middle finger of one Michael Vincent LaCorte." The defendant took exception to the use of the word "identical" and argues that the expert invaded the province of the jury by expressing an opinion as to an ultimate fact. There was no error. This court has held that "a question which calls for an opinion which is in the domain of the expert's professional knowledge is not necessarily to be excluded merely because the conclusion of the witness reaches or approaches the ultimate issue before the jury." *Commonwealth* v. *Montmeny,* 360 Mass. 526, 527-528 (1971). Compare *Commonwealth* v. *Lannon,* 364 Mass. 480, 484 (1974), and *Commonwealth* v. *Boudreau,* 362 Mass. 378, 380 (1972), with *Commonwealth* v. *Gardner,* 350 Mass. 664, 665-667 (1966). The many jurisdictions that have considered the issue essentially agree that such testimony by a fingerprint expert does not usurp the function of the jury, even though it may touch on an ultimate fact which the jury must determine. See, e.g., *State* v. *Taylor,* 201 N.W.2d 724, 726-727 (Iowa 1972), overruling *State* v. *Steffen,* 210 Iowa 196, 200 (1930); Annot., 28 A.L.R.2d 1115, § 25 (1953 & Supps. 1970, 1977). We find that there was no danger here "that the jury might forego independent analysis of the facts and bow too readily to the opinion of an expert or otherwise influential witness." McCormick, Evidence § 12, at 27 (2d ed. 1972).

4. The defendant has assigned as alleged errors several evidentiary rulings by the judge excluding questions put to prosecution witnesses on cross-examination. We hold that there was no error in any of the rulings. The questions raised are not novel, and all involved the element of judicial discretion with no showing of any abuse of that discretion. We therefore describe the alleged errors only to the extent necessary to identify them in disposing of the claims of error.

(a) While cross-examining one Officer Charbonnier, defense counsel showed the witness certain photographs, admitted as exhibits, depicting the room where White's body

was discovered. Counsel was attempting to demonstrate where the coffee cup bearing LaCorte's fingerprints was to be found in each picture. After a number of similar questions, the judge excluded further oral testimony and submitted the photographs to the jury. The witness had not been present when the photographs were taken, and his responses were nothing more than his own interpretation of them. The exclusion reveals no error. See generally *Commonwealth* v. *Sandler*, 368 Mass. 729, 737-738 (1975). A trial judge may, in his discretion, limit cross-examination in the interest of clear and orderly presentation of the evidence. The judge's action in no way precluded counsel from proving, if he could, that the fingerprint on the cup was due to LaCorte's presence in the apartment on some occasion prior to the murder.

(b) The trial judge excluded a question put to witness Sapauskas which would have established that Sapauskas entered the Warrenton Center for Addiction on October 9, 1974 — five days after LaCorte had reenacted the murder in the presence of Sapauskas and others. The judge ruled the testimony immaterial, and we agree. The defendant argues that this exclusion prevented counsel from inquiring into the witness's possible mental impairment at the time he witnessed LaCorte's dramatization. We find from the record, however, that Sapauskas's drug addiction at the time of the reenactment was the subject of extensive cross-examination. There was no error.

(c) The patrolman who discovered White's body, one Officer Bickerton, was asked on cross-examination whether he "had some information whether or not a woman had been in the apartment at about 5:30 that morning?" The prosecutor did not object, but the judge excluded the question on his own motion. It is true that the neighbor who had called the police testified to seeing a woman running from White's building with two men. Officer Bickerton himself testified that he had found women's clothing in White's apartment. Clearly, however, Officer Bickerton could have had no first hand knowledge of the presence of a woman at the scene prior to his arrival, and the judge

might have excluded the question on this ground. Since there is no suggestion by the defense that Officer Bickerton had any such knowledge, counsel's reliance on *Commonwealth* v. *Johnson,* 365 Mass. 534 (1974), is misplaced.

5. The defendant argues that the prosecutor asserted his personal belief in the defendant's guilt during his closing argument to the jury. There is no merit to this contention. The prosecutor said: "I'm fully confident... as sure as my name is Doyle, that I expect a truthful verdict by twelve people of courage, by twelve people joined together in a single unit dedicated to one purpose and one purpose alone: What is the truth in this case." This argument was not improper. Both judge and counsel may properly impress upon the jury their duty to act with courage as well as impartiality. *Commonwealth* v. *Clark,* 292 Mass. 409, 411 (1935). The defendant's motion for a mistrial was properly denied.

6. We have reviewed the entire record in accordance with our duties under G. L. c. 278, § 33E. We find that the verdict is in accordance with the law and the weight of the evidence, and we observe nothing which in justice indicates that we should modify the result reached by the jury.

*Judgment affirmed.*