COMMONWEALTH *vs.* PHILIP MORRIS, JR.

Middlesex. November 6, 1995. - March 12, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, O'CONNOR, GREANEY, & FRIED,
JJ.

*Evidence,* Fingerprints, Identification. *Identification. Practice, Criminal,*
Reasonable doubt, Required finding.

Evidence at the trial of indictments for first degree murder and armed as-
sault in a dwelling was not sufficient for a rational jury to have concluded
beyond a reasonable doubt that the defendant was one of several intrud-
ers who shot the victim, where the only evidence implicating the defen-
dant was his thumbprint, which the Commonwealth did not prove was
impressed there during the commission of the crime, on a plastic mask
left at the scene, that had been worn by one of the intruders. [256-260]

INDICTMENTS found and returned in the Superior Court
Department on December 24, 1991.

The cases were tried before *Catherine A. White,* J.

*Max D. Stern (Lenore M. Glaser* with him) for the defen-
dant.

*Marguerite T. Grant,* Assistant District Attorney, for the
Commonwealth.

WILKINS, J. In his appeal from convictions of murder in
the first degree and of armed assault in a dwelling, the defen-
dant principally argues that the evidence did not warrant a
finding beyond a reasonable doubt that he was one of a group
of intruders who, on November 15, 1991, entered a third-
floor apartment in a building on Clark Street in Malden. The
apartment was a place of business of a Boston area drug
retailer named Daniel Woodley. The intruders mortally
wounded Woodley's roommate David Morley. We conclude
that the defendant's motion for required findings of not guilty
should have been allowed.[1]

---

[1]Two other alleged intruders, brothers Whittaker and Kenneth White,
had been tried together earlier and convicted of murder in the first degree
and armed assault in a dwelling. *Commonwealth* v. *White, post* 487 (1996).

We set forth the evidence most favorable to the Commonwealth. Shortly before 4 P.M. on November 15, 1991, Michael Kalil, a regular purchaser of crack cocaine from Woodley, arrived at Clark Street to drive the victim to his first day of work at a new job. Kalil started up the stairs to Woodley's third-floor apartment. When Kalil had passed the first landing, a masked black man placed a weapon at Kalil's head and forced him up the stairs. At the third floor, there were four more black gunmen whose faces were partly obscured by masks. One man was carrying a shotgun and wearing a clear plastic clown mask and a black Los Angeles Raiders jacket.

Kalil, instructed to knock on the door of the third-floor apartment, did so. When the victim asked who it was, Kalil replied, "It's Mike." When the victim unlocked the door, the gunmen shoved Kalil through the door and burst into the apartment, announcing "Police, freeze. Nobody move." The gunman wearing the clown mask and the gunman who had first encountered Kalil shot the victim. Woodley and two other occupants of the apartment had hidden themselves when the intruders burst into the apartment and were not hurt. After about one minute, the intruders ran out of the apartment.

Before this incident occurred, Herbert Smith had been trying to replace a radiator in a friend's automobile parked on Clark Street. As he was packing up his tools, he heard what sounded like gunshots coming from up the street. Smith next saw four black men walking toward him from the direction from which he had heard gunshots. Two men entered a light brown, four-door Nissan Stanza automobile with Massachusetts license plates. Two other men entered a Camaro hatchback automobile, which had a dent in the front fender with a piece of molding hanging off it. The vehicles sped off. When police arrived, Smith gave an officer a description of the vehicles. He said that the Camaro had a New York license plate with "F52" or "F55" on it. At trial Smith identified pictures of the Camaro and its New York license plate, with "F5" as the first two symbols.

Based on Smith's description of the Camaro, Boston police later that day stopped it several blocks from the defendant's residence and arrested its occupants, the White brothers. A gun in the vehicle was identified by a ballistics expert as one used in the Malden incident. Kalil identified clothing in that vehicle as clothing worn by one or more of the intruders and

a photograph of a second gun as a gun like that carried by one of the intruders. Smith later went to a Boston police station and identified the Camaro.

On cross-examination, Smith testified that he had no doubt that the other vehicle, the light brown one with a Massachusetts license plate, was a Nissan, and not a Toyota. The make of the light brown vehicle was important because the Commonwealth introduced evidence that the defendant's mother owned a light brown, four-door Toyota Cressida that could have been found to resemble the Massachusetts vehicle that Smith identified.

The intruders had left the clear, colorless plastic clown mask on the first-floor landing of the Clark Street apartment house. A thumbprint on the mask had twenty-three points of comparison with the defendant's right thumbprint. Expert testimony indicated that the thumbprint on the mask was the defendant's. There was evidence of telephone calls, which we recite in more detail later, that linked the defendant's residence, and inferentially the defendant, to the White brothers.

Kalil testified that the man wearing the clown mask resembled the defendant (and also resembled another man Kalil knew). Kalil also testified that he had given descriptions to the police of what each intruder was wearing, what weapons each carried, and the height and weight of four of the intruders. This information was included in a police report that was read to the jury. There was hearsay evidence of the height and weight of the fifth intruder, a subject that we discuss later.

The judge instructed the jury that the Commonwealth had to prove that the defendant was present at Clark Street when the crimes were committed, that he participated in the incident, and that he was wearing the clown mask at that time. After three days of deliberations, the jury returned guilty verdicts.

We review the evidence in the light most favorable to the Commonwealth, along with reasonable inferences therefrom, to determine whether the evidence was sufficient to persuade a rational jury beyond a reasonable doubt of every element of the crime charged. See *Commonwealth* v. *Campbell,* 378 Mass. 680, 686 (1979); *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979). In the circumstances of this case, the question is whether, on the standard stated above, the Com-

monwealth presented sufficient evidence to warrant a finding beyond a reasonable doubt that the defendant was one of the intruders.

The fact that the defendant's thumbprint was on the mask was admissible (*Commonwealth* v. *LaCorte*, 373 Mass. 700, 702 [1977]), and the defendant rightly does not argue otherwise. Fingerprint evidence coupled with other evidence may rationally link a defendant to a crime. See *Commonwealth* v. *Phoenix*, 409 Mass. 408, 430-431 (1991); *Commonwealth* v. *Fazzino*, 27 Mass. App. Ct. 485, 488 (1989). Where, for example, there is evidence that a person touched an object, and it is later proved that the defendant's fingerprints were on that object, an inference that the defendant was present at the time of the touching is warranted. See *Commonwealth* v. *Salemme*, 395 Mass. 594, 599 (1985); *Commonwealth* v. *Clark*, 378 Mass. 392, 404-406 (1979); *Commonwealth* v. *Dubois*, 353 Mass. 223, 224-225 (1967); *Commonwealth* v. *Keaton*, 36 Mass. App. Ct. 81, 85 (1994). If, however, the only identification evidence is the defendant's fingerprint at the crime scene, the prosecution must prove beyond a reasonable doubt that the fingerprint was placed there during the crime. See *Commonwealth* v. *LaCorte, supra* at 703; *Commonwealth* v. *Fazzino, supra* at 487.

The Commonwealth agrees that it had the burden of proving beyond a reasonable doubt that the defendant's thumbprint was impressed on the mask at the crime scene. It argues that the evidence was sufficient to permit a reasonable jury to make such a finding beyond a reasonable doubt. We review the evidence.

The thumbprint itself was powerful evidence that the defendant had touched the mask found on the first-floor landing. The Commonwealth's expert testified, however, that he could not tell when the print was placed on the mask. The jury were warranted in finding that one of the fleeing intruders dropped the mask where it was found, that conditions at the crime scene permitted the impression of a thumbprint on the smooth, clean surface of the mask, and that a fingerprint is very fragile, subject to smudging and obliteration. The jury were also warranted in inferring that the mask had been concealed in some way when it was brought to the scene. Although this evidence and reasonable inferences from it tend to indicate that the thumbprint might have been placed on

the mask shortly before or during the crime, the evidence would not warrant a finding beyond a reasonable doubt that the print was placed on the mask during the crime.

The Commonwealth points to other evidence from which, it contends, a finding could be made that the defendant was one of the intruders. Kalil testified on cross-examination that he thought that he recognized the man in the clown mask as a person he knew named Francis but could not tell because of the mask. He volunteered that the man in the clown mask also resembled the defendant. However, Kalil attributed to the intruder who wore the clown mask a height and weight at least three inches taller and forty pounds heavier than the defendant. There was also evidence that the height and weight of one of the other intruders, not the one wearing the clown mask, were similar to the defendant's height and weight.[2]

One of the two vehicles in which two intruders could have been found to have left the scene was a brown four-door vehicle that was consistent in appearance with the Toyota Cressida that the defendant's mother owned. On the other hand, Herbert Smith, who accurately identified the other vehicle, testified that the brown vehicle that he saw was a Nissan Stanza. There was no evidence concerning the defendant's access to and right to use his mother's vehicle.

There was evidence that linked the defendant, or at least his residence, to the White brothers, who, when stopped in the Camaro that Herbert Smith had identified, had a gun that had been used and items that were present during the crime. Approximately four hours before the crimes, someone had called Whittaker White's beeper from the telephone at the defendant's residence. About two and one-half hours after the crimes, someone telephoned from the defendant's residence to a New York number associated with Whittaker White. The police stopped the White brothers less than one-half hour

---

[2]The defendant objected to the admission of this evidence, and pursues the point on appeal. We do not reach the issue. The judge charged the jury that they could find the defendant guilty only if they found that he was the intruder who wore the clown mask. That jury instruction, of course, has no bearing on the defendant's challenge to the denial of his motion for a required finding of not guilty. It does mean, however, that, as the case was submitted to the jury, evidence that one of the other intruders was of the defendant's approximate height and weight was made insignificant in deciding whether the defendant was at the scene of the crime.

later a few blocks from the defendant's home. During his booking at the police station, Kenneth White dialed the defendant's telephone number. About an hour later, someone at the defendant's residence called the New York number associated with Whittaker White. From November to December, 1991, someone at the defendant's telephone accepted collect calls from the public telephone in the cellblock in which Whittaker White and thirteen others were being held. The defendant argues that another man whose fingerprints were found at the crime scene could have used the telephone at the defendant's home. The jury were entitled to infer, however, that it was the defendant who received the various telephone calls and made or permitted calls to be made from his home.

The question is whether (1) a witness's statement that the intruder wearing the clown mask might have resembled the defendant or another man, (2) the ownership by the defendant's mother of a vehicle that resembled, but was not identical to, one seen leaving the crime scene, and (3) his association with two people who could have been found to have been two of the intruders, was enough to permit the jury to have found beyond a reasonable doubt that the defendant had been at the crime scene and impressed his thumbprint on the mask at that time.

The jury could have reasonably inferred that the defendant had been involved with the White brothers and that he might have been one of the intruders. The evidence does not, however, warrant such a conclusion beyond a reasonable doubt. The defendant's association with the White brothers, standing alone, falls short of warranting such a finding. See *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965). The White brothers may have simply used the defendant's home as a base of operations. The defendant's possible resemblance to one of the intruders, the general resemblance of the motor vehicle owned by the defendant's mother to a vehicle leaving the crime scene, and the clarity of the thumbprint add little weight to the evidence. In short, the defendant's association with the White brothers did not warrant a finding beyond a reasonable doubt that the thumbprint was placed on the mask

during the commission of the crime. On the evidence a doubt
that was reasonable as to the defendant's guilt had to remain.

*Judgments reversed.*

*Verdicts set aside.*

*Judgments for the defendant.*