WENDLANDT, J.
*104 Following a jury trial, the defendant was convicted of armed robbery while masked, pursuant to G. L. c. 265, § 17, and assault by means of a dangerous weapon, pursuant to G. L. c. 265, § 15B(b ). On appeal, the defendant argues that there was insufficient evidence to support the conviction of armed robbery while masked under Commonwealth v. Morris, 422 Mass. 254, 662 N.E.2d 683 (1996). Applying the Supreme Judicial Court's jurisprudence regarding the sufficiency of fingerprint evidence found on a moveable object at a crime scene to the deoxyribonucleic acid (DNA) evidence in this case, we agree.
Background. On July 3, 2013, two men broke into a Burger King in Easton at around 11:30 P.M. and stole approximately $3,000.
*105 Both men were described by the restaurant manager, who was present during the robbery, as African-American and wearing blue surgical masks. The first assailant was approximately six feet tall, and armed with a gun; he wore a dark hooded sweatshirt. The second assailant, who wore a tan hooded sweatshirt, was "a little bit taller" than the armed man.
Surveillance recordings from the Burger King and the neighboring Dunkin' Donuts captured images of both men as they fled the crime scene. The recordings showed the second assailant removing his mask and, as he is fleeing the crime scene, tossing something into the Dunkin' Donuts plaza. His profile was captured in one of the recordings; however, the recording (and the still photographs captured from it) were grainy and of extremely poor quality.[1] The surveillance recordings also captured a white vehicle matching the make and model of the defendant's mother's vehicle.[2]
One of the police officers who responded to the crime scene discovered two cloth *702 items-a white toddler-sized T-shirt and a blue knotted bandana-in the Dunkin' Donuts plaza. The Commonwealth's theory was that the defendant was the second assailant. Based on the recordings,[3] the Commonwealth argued that the second assailant threw the cloth items into the Dunkin' Donuts plaza as he passed it and that he wore the T-shirt as a mask during the robbery, while his coventurer wore the bandana.
The T-shirt and the bandana were tested for DNA. First, a criminologist collected two samples from the T-shirt-one from the interior of the T-shirt and one from the exterior. She also collected one sample from the bandana. Each of the samples was collected by scraping the material with a scalpel to loosen any skin cells that may have been imbedded in the fibers and then taking a swab.[4] Second, a DNA analyst tested the samples to determine whether the defendant's DNA matched the DNA on *106 the samples. Each sample from the T-shirt had the DNA of more than one person; the bandana contained DNA from at least three individuals.
For the T-shirt samples, the major profile matched the defendant's DNA profile.[5] One of the major profiles of the bandana also matched the defendant's DNA profile.[6] The DNA analyst could not determine when any of the defendant's DNA was deposited on either the T-shirt or the bandana.
The defense at trial was that the defendant was in Quincy at the time of the Easton robbery. Three witnesses testified in support of his alibi. Quincy police Officer Stephen O'Donaghue testified that he had seen the defendant, along with his friend, Mark Cram, at a street festival in Quincy sometime between 5:00 P.M. and 7:00 P.M. Cram similarly testified that he had been with the defendant at the festival until approximately 9:30 P.M., when Cram got into a fight and suffered an eye injury. According to Cram, the defendant accompanied him first to his mother's home and then to the hospital, both of which were in Quincy. Cram's mother, Marie Lawson, corroborated that the defendant had brought Cram home and had accompanied them to the hospital around 10:45 P.M.[7] Cram and Lawson testified that the defendant remained alone in Lawson's medical transportation van, which had a wheelchair sticker on the back, in an emergency parking spot while Cram was treated in the emergency department. Lawson testified *703 that they left the hospital around midnight or 1:00 A.M., and returned to her home where the defendant remained until at least 3:00 A.M.
The evidence also showed that the defendant's brother had *107 been involved in a robbery in Weymouth with a similar modus operandi. In particular, a couple of months after the Easton robbery, the brother was arrested, along with another man,[8] following an armed robbery of a store in Weymouth. As in the Easton robbery, both men were armed and masked. Furthermore, the brother, who lived with his mother and had access to and often drove her vehicle, was driving the mother's vehicle just prior to the Weymouth robbery. A search of the trunk of the vehicle revealed several items of clothing, and the brother's driver's license was found in the center console. Following the Weymouth robbery, the brother fled to Rhode Island and was eventually captured. In addition to comparing the defendant's DNA to the DNA from the T-shirt and bandana samples from the Easton robbery, the DNA analyst also compared the brother's DNA to these samples. His DNA profile was not a major profile on any of the three samples, but he could not be ruled out as a minor profile on either the T-shirt (because the data were insufficient for testing) or the bandana (because the mixture was too complex).
Discussion. 1. Application of Morris to DNA. On appeal, we must first consider whether the principle articulated in Morris and its progeny concerning fingerprint evidence applies to the DNA evidence in this case. In Morris, the defendant was convicted of murder in the first degree and armed assault in a dwelling, based on a fatal shooting by masked intruders. 422 Mass. at 254-255, 662 N.E.2d 683. One intruder wore a clown mask. Id. at 255, 662 N.E.2d 683. At trial, the Commonwealth introduced evidence that the defendant's thumbprint was found on a clown mask that was left by an intruder at the scene of the crime. Id. at 256, 662 N.E.2d 683. The Supreme Judicial Court reiterated the principle that where "the only identification evidence is the defendant's fingerprint at the crime scene, the prosecution must prove beyond a reasonable doubt that the fingerprint was placed there during the crime." Id. at 257, 662 N.E.2d 683, citing Commonwealth v. LaCorte, 373 Mass. 700, 703, 369 N.E.2d 1006 (1977) ("[W]hen fingerprints constitute the only identification evidence, most jurisdictions require the prosecution to establish beyond a reasonable doubt that the fingerprints in fact were placed at the scene during the commission of the crime"). Thus, although fingerprint evidence is generally admissible and certainly can be powerful evidence in support of the Commonwealth's case, for the purpose *108 of establishing the sufficiency of the evidence, we have "generally recognized that fingerprint evidence found at the scene of a crime must be coupled with evidence of other circumstances tending to reasonably exclude the hypothesis that the print was impressed at a time other than that of the crime." Commonwealth v. Baptista, 32 Mass. App. Ct. 910, 911, 585 N.E.2d 335 (1992), quoting from Commonwealth v. Clark, 378 Mass. 392, 405-406, 393 N.E.2d 296 (1979). See Commonwealth v. French, 476 Mass. 1023, 1024, 68 N.E.3d 1191 (2017) ; Commonwealth v. Ye, 52 Mass. App. Ct. 390, 393, 754 N.E.2d 86 (2001).
This principle applies because the presence of a fingerprint on an object alone provides insufficient data to determine *704 when the fingerprint was placed on the object. United States v. Corso, 439 F.2d 956, 957 (4th Cir. 1971) (cited in LaCorte, 373 Mass. at 703, 369 N.E.2d 1006 ). See Ye, 52 Mass. App. Ct. at 391-392, 754 N.E.2d 86. Indeed, fingerprints can last for months after placement. Corso, supra. See French, 476 Mass. at 1024, 1025, 68 N.E.3d 1191 (noting testimony of fingerprint analyst that "a fingerprint cannot be dated and can remain on a surface for a long period of time," and concluding that "the fingerprint could have been left at some previous time, unrelated to the break-in"). See also State v. Mayell, 163 Conn. 419, 426, 311 A.2d 60 (1972) (fingerprints on rearview mirror of abandoned vehicle used during robbery and used by the defendant six hours before the crime was committed in connection with his employment "does not establish his connection with the crime charged"; cited in LaCorte, 373 Mass. at 703, 369 N.E.2d 1006 ).
According to the testimony in this case, the same is true for DNA evidence-that is, its presence on an object alone does not provide sufficient information to determine when the DNA was deposited on the object. In fact, the testimony of the DNA analyst shows that the concerns are even more acute with regard to DNA than with regard to fingerprints. The DNA analyst testified that DNA may cling to an object for decades after it is deposited.[9] She further testified that, unlike fingerprints, an individual can deposit DNA on an object without touching it through a process called "secondary transfer."[10] According to the DNA analyst's testimony, it was impossible to determine from the laboratory *109 results when the defendant's DNA was deposited on either the T-shirt or the bandana, whether it was the defendant who had most recently handled either object, or indeed (in view of the potential for secondary transfer) whether the defendant had directly handled the T-shirt or the bandana at all.
Given the evidence that the presence of the defendant's DNA, like the presence of a fingerprint, did not provide sufficient information to determine when the DNA was deposited on the object, we agree that Morris governs this case.[11] The presence of *705 the defendant's DNA alone was insufficient to provide the jury with enough evidence to sustain the conviction beyond a reasonable doubt.
2. Sufficiency of the evidence. Applying Morris, the question then is whether the DNA evidence coupled with the other evidence presented by the Commonwealth was sufficient to allow a jury to find beyond a reasonable doubt that the defendant committed the crime. In conducting our analysis, we view the evidence in the light most favorable to the Commonwealth. Commonwealth v. Latimore, 378 Mass. 671, 676-677, 393 N.E.2d 370 (1979). The Commonwealth points to three items of evidence tying the defendant to the crime. First, the Commonwealth relies on the evidence that the defendant's DNA was the only major profile on the child's T-shirt and the bandana. Second, the Commonwealth relies on the surveillance footage showing that the make, model, and year of the car used by the assailants matched the defendant's mother's car. Third, the Commonwealth relies on the surveillance footage showing the second assailant and his profile.
*110 Again, the decision in Morris informs our analysis. There, in addition to the thumbprint on the clown mask, the Commonwealth introduced evidence that the defendant matched the general description of one of the intruders, that the defendant's mother owned a vehicle resembling one seen fleeing the scene of the crime, and that the defendant was a known associate of two of the other intruders. 422 Mass. at 258, 662 N.E.2d 683. On appeal, the court found that the evidence of the thumbprint, in combination with the other evidence of identity of the perpetrator, would have allowed a jury to reasonably infer that the defendant was one of the intruders, but that "[t]he evidence does not, however, warrant such a conclusion beyond a reasonable doubt." Id. at 259, 662 N.E.2d 683.
Like the clown mask with a fingerprint on it in Morris, the T-shirt and the bandana with the defendant's DNA are portable objects that suggest that the defendant, at some point, may have touched the objects.[12] Alone, however, it does not establish that the defendant was one of the assailants who wore the objects during the crime, and is not enough to support a conviction beyond a reasonable doubt. See id. at 257-259, 662 N.E.2d 683. See also French, 476 Mass. at 1024-1025, 68 N.E.3d 1191 (evidence that the defendant's fingerprint was found on plexiglass window removed during robbery insufficient to establish beyond a reasonable doubt that the fingerprint was placed there during the crime where top of window was reachable by any passerby and had been left for several hours overnight on the ground where others could have touched it). Accord Commonwealth v. Renaud, 81 Mass. App. Ct. 261, 262-263, 961 N.E.2d 1102 (2012) (electronic bank transfer card with the defendant's name, which was found at a crime scene and taped together in three pieces, was sufficient to infer that the defendant possessed the card but was insufficient to establish that he possessed it and dropped it during the crime).
To tie the defendant to the vehicle used by the assailants, the Commonwealth points to the evidence that the vehicle on the surveillance recording was the same make and model as the mother's vehicle, the brother used the mother's vehicle for *706 the Weymouth robbery with a similar modus operandi, the brother *111 often drove the mother's vehicle, and on at least two occasions the defendant was a passenger while the brother was driving. Such an attenuated connection to a vehicle involved in the robbery is not enough to support a conviction beyond a reasonable doubt.[13] See Morris, 422 Mass. at 257-259, 662 N.E.2d 683 (insufficient evidence even though the defendant's mother owned a vehicle resembling one seen leaving the scene).
With regard to the second assailant's profile on the surveillance footage, it shows that this assailant was likely a black man, about the same height and build as the first assailant. However, the profile on the surveillance recording is of such poor quality that it cannot reasonably be used for the fine analysis required to establish that the defendant's profile matches the profile on the recording. The still images from the surveillance recording are even grainier. Accord Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 328, 729 N.E.2d 642 (2000) (witness's identification of an individual based on his familiarity with the defendant properly admitted because, inter alia, videotape of crime was "of poor quality although not 'hopelessly obscure' ").
Here, taken as a whole, the evidence does not support conviction beyond a reasonable doubt. See Morris, 422 Mass. at 257-260, 662%20N.E.2d%20683">662 N.E.2d 683.[14]
Judgments reversed.
Verdicts set aside.
Judgments to enter for

Trial counsel's objection, a still image from the booking recording of the defendant was shown to the jury, and the defendant was asked to stand with his profile to the jury, ostensibly to allow the jury to compare the defendant's profile to the grainy profile captured on the surveillance recording.

The mother's car was a 2005 Cadillac CTS, and an automotive expert opined that the vehicle captured on the surveillance recording was a 2004 or 2005 Cadillac CTS.

Based on the recordings, the jury could have found that the manager was mistaken that the assailants wore blue surgical masks.

The criminologist testified that there were so many stains on the T-shirt that no tests were performed to determine the DNA of the fluids on the T-shirt. The criminologist was able to test one stain on the bandana for bodily fluids; however, the test came back negative.

The frequency of occurrence of the major profile in the African-American population was one in 23.25 quadrillion; in the Asian population, one in 143.1 quadrillion; in the Caucasian population, one in 239.6 quadrillion; and in the Hispanic population, one in 29.10 quadrillion. Using an updated database from the National Institute of Standards and Technology, the statistics show that the frequency of occurrence in the African-American population was one in 25.76 quintillion; in the Asian population, one in 569.8 quintillion; in the Caucasian population, one in 500.5 quintillion; and in the Hispanic population, one in 70.22 quintillion.

The frequency of occurrence of the major profile in the African-American population was one in 260,000; in the Asian population, one in 1.588 million; in the Caucasian population, one in 4.429 million; and in the Hispanic population, one in 1.110 million.

Cram, who had consumed alcohol and then pain medication that evening, believed that it was 10:00 P . M . when they left for the hospital.

The second assailant in the Weymouth robbery was shorter and heavier than the second assailant in the Easton robbery.

Here, the Commonwealth provided no evidence suggesting more rapid DNA degradation. Cf. Diaz vs. Hughes, U.S. Dist. Ct., No. SA CV 14-1819-SJO(E), 2015 WL 1728367 (C.D. Cal. Jan. 27, 2015).

The DNA analyst described secondary transfer as follows: (i) an individual touches one object, depositing his DNA on it; (ii) that object then contacts an "intermediary object," leaving the individual's DNA on the intermediary object; and (iii) the intermediary object then touches a third object, thereby depositing the individual's DNA on the third object.

Accord State v. Freeman, 269 S.W.3d 422, 425 (Mo. 2008) (defendant's DNA on toilet paper found underneath victim's body sufficient where "opposite inference-that [d]efendant's DNA arrived on the tissue in some innocent manner-requires an unlikely series of events"); People v. Rush, 165 Misc. 2d 821, 823, 630 N.Y.S.2d 631 (N.Y. Sup. Ct. 1995), aff'd, 242 A.D.2d 108, 672 N.Y.S.2d 362 (1998) (DNA evidence alone is sufficient only where "the hypothesis of guilt ... flow[s] naturally from the facts proved, and [is] consistent with them and ... exclude[s] 'to a moral certainty every reasonable hypothesis of innocence' " [citation omitted] ); State v. Pastuer, 205 N.C. App. 566, 574-577, 697 S.E.2d 381 (2010) (reversing denial of motion to dismiss based on insufficient evidence where the victim's DNA was found on the defendant's shoe because the DNA could have been deposited at a time other than during the crime); State v. Toomes, 191 S.W.3d 122, 131 (Tenn. Crim. App. 2005) (defendant's DNA alone sufficient in the absence of any conceivable "innocent reason" for its presence); Bean v. State, 373 P.3d 372, 388 (Wyo. 2016) ("when a defendant's presence can be innocently explained, to be relevant to establish guilt, the DNA evidence must be found in a place or manner inconsistent with innocent contact").

In fact, although the presence of a fingerprint on an object suggests a particular person (the person whose fingerprint matches) touched the object, the testimony of the DNA analyst suggests that the evidence of DNA matching the defendant's DNA on the objects (without more) establishes only that the defendant may have touched something or someone that then touched the objects.

In the Weymouth robbery, another man was the leading suspect as the brother's coventurer; however, that man's physical attributes do not match the description of the second assailant in the Easton robbery.

Because we reverse the judgment on this basis, we need not address the defendant's remaining arguments.