NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1099

COMMONWEALTH

vs.

LAMAAR MATTHEWS.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a bench trial in the Superior Court, the defendant was convicted of several charges stemming from a home invasion and armed robbery.  On appeal from the judgments of conviction, he claims the evidence was insufficient.  We affirm.

Background.  The victims of the defendant's crimes were a father and son.  On January 12, 2021, at approximately 1 A.M., the son went to sleep in his bedroom located downstairs in his family's home.  He awoke when he heard his bedroom door creak open and then close.  He turned on the flashlight on his red iPhone XR[1] (phone), opened the door, and yelled "hello.  Hello." The son heard footsteps and saw a "shadow" come toward him.  He closed his door, stood against it, and yelled for help.  The

---

[1] He kept the phone either on his person or in his bedroom when at home.  He never let other people use his phone.

door was pushed open, causing the son to fall.  A male intruder entered the bedroom, took the phone from the son's hand, turned off the flashlight, and put it in his pocket.  In the darkened room the son felt the man press an object that the son believed to be a knife into his stomach while the man repeatedly asked, "where the shit at."

The son heard the father running toward his bedroom.  The intruder got off of the son and left the bedroom.  When the father reached the bottom of the stairs, he encountered a male intruder who was about the father's height; the man swung a knife at the father and told him to back up.  The father yelled to his wife to "grab the gun."  The intruder fled the house through the front door.  The father then approached the son's bedroom where he encountered a second male intruder coming out of the room.  The father described the second intruder as dark skinned and much shorter than the first intruder.[2]  The second man also swung a knife, and then he fled the house through the back door.

Several police officers were dispatched to the home, arriving at approximately 2:50 A.M.  While in route, police were

---

[2] At trial, the father testified that both intruders wore "hoody" sweatshirts.  Although he did not remember the color of the sweatshirts, the father acknowledged that he told police officers that the first man wore a gray one, and the second man wore a green one.

2

told that the suspects were two Black men.  On this "extremely cold" night, officers did not see any individuals or cars in the surrounding area.  At approximately 2:55 A.M., police officer Colby Gallagher saw a man matching the suspect's description about four tenths of one mile from the victims' home.  Gallagher did not see anyone else or any cars in the area at that time. He stopped and spoke to the man, who was sweating and breathing heavily despite the cold temperature.  The father was driven to the location and positively identified the man as the first of the two men he encountered in his home.  The suspect, a juvenile,[3] was arrested.

Police asked the son to use the "Find My iPhone" application to track his stolen phone's location.  The son did so; the phone appeared to be at a location within one mile from the home.  At 3:47 A.M., police officer Christopher Davis received a radio transmission about the potential location of the phone.  He proceeded to a "heavily wooded" area where there were no streetlights or sidewalks.  Davis did not see any pedestrians or cars in the area.  He located the phone, with its

---

[3] At booking, the juvenile's height was recorded as five feet ten inches, and his weight as 130 pounds.  A search warrant executed on the juvenile's cell phone showed three incoming calls between 3 A.M. and 3:20 A.M., but police were unable to identify the caller.  The juvenile received three text messages from a different number during the same time frame.  Police were unable to identify the sender.

3

flashlight on, twenty to thirty feet into the woods, in some thorns and brush.  Davis did not touch the phone.  The son had not been in this area, did not know anyone that lived in this area, never met the defendant, and never left his phone unattended in a public place or allowed a stranger to use it.

Photographs of the phone and its location were taken by detective Daniel Barber.  Barber could not walk a straight line from the road to the location of the phone due to thick brush and thorns.  He found the phone, flashlight on, twenty-five to thirty feet into the woods, at the bottom of a thorn bush that was undisturbed.  Wearing gloves, Barber removed the phone from the brush, examined it, and noticed what appeared to be fingerprints.  The son identified the phone as the one taken during the crimes.  Subsequent testing revealed five latent fingerprints on the phone that matched the defendant's fingerprints.[4]  The defendant was arrested on April 28, 2021, at his home in the Dorchester section of Boston, approximately four months after the crimes.[5]

---

[4] There were two left index fingerprints, a left little fingerprint, a right middle fingerprint, and a right little fingerprint.  The defendant was excluded as the source of one fingerprint.

[5] The defendant's home was approximately twenty miles from the victims' home.  At booking, the defendant's height was recorded as five feet ten inches, and his weight as 160 pounds.

Discussion.  As he did at trial, on appeal, the defendant does not contest that his fingerprints were on the phone. Rather, he claims that the evidence was insufficient to prove that his fingerprints were placed on the phone during the commission of the crimes.  We are not persuaded.

"In determining whether the Commonwealth met its burden to establish each element of the offense charged, we apply the familiar Latimore standard. . . .  '[The] question is whether, after viewing the evidence in the light most favorable to the [Commonwealth], any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Commonwealth v. Colas, 486 Mass. 831, 836 (2021), quoting Commonwealth v. Latimore, 378 Mass. 671, 677 (1979).  Inferences may be drawn from the evidence, but they "need not be necessary or inescapable, only reasonable and possible" (quotation and citation omitted).  Commonwealth v. Schoener, 491 Mass. 706, 714 (2023).  In a jury-waived trial, it is presumed that the judge correctly instructed herself on the law.  See Commonwealth v. Qasim Q., 491 Mass. 650, 664 (2023).

Here, there was direct evidence that one of the intruders handled the son's phone during the crimes.  The son saw the man take the phone from his hands, turn off the flashlight, and put the phone in his pocket.  In addition, there was direct and circumstantial evidence that neither the son nor the father met

5

or knew the defendant, and that the son never left his phone unattended in a public place or allowed anyone to use it. This evidence, in combination with the defendant's fingerprints on the phone, sufficed to support a conclusion that the defendant was one of the intruders and that his fingerprints were impressed on the phone when he handled it during the crimes. See Commonwealth v. Morris, 422 Mass. 254, 257 (1996) ("Where, for example, there is evidence that a person touched an object, and it is later proved that the defendant's fingerprints were on that object, an inference that the defendant was present at the time of the touching is warranted").

As in this case, when "the only identification evidence is the defendant's fingerprint at the crime scene, the prosecution must prove beyond a reasonable doubt that the fingerprint was placed there during the crime." Morris, 422 Mass. at 257. Viewing the evidence in the light most favorable to the Commonwealth, we also conclude that the Commonwealth met its burden to exclude the hypothesis that the defendant's fingerprints were impressed under innocent circumstances after the crimes. Police located the phone within one hour of the crimes, and within one mile of the victims' home. The phone was found at the bottom of undisturbed brush with thorns, more than twenty feet from the side of the road. It was a heavily wooded area that was difficult to navigate, had no streetlights or

sidewalks, and there was little to no foot or vehicle traffic in that area from the time of the crimes to the discovery of the phone.  Cf. Commonwealth v. Palmer, 59 Mass. App. Ct. 415, 419-420 (2003) (sufficient circumstantial evidence where truck with defendant's fingerprints that was used to flee crime scene was found in area "not readily visible from the street, thereby making it unlikely someone would see it, approach it, and touch it during the three hours before it was found").  Contrast Commonwealth v. French, 476 Mass. 1023, 1025 (2017) (insufficient circumstantial evidence where windowpane with defendant's fingerprint, removed during break-in and set in front of store, "could have been readily accessible to any passerby for several hours or more").  Here, the circumstantial evidence, in combination with the son's testimony that he saw one of the intruders handle his phone during the crimes, sufficed to reasonably exclude the hypothesis that the defendant's fingerprint was impressed at a time other than when the crimes were being committed.

The defendant also argues that the Commonwealth did not exclude the possibility that the defendant may have touched the phone before it was found in the woods as a driver or passenger in a car fleeing the crimes.  Because we evaluate the evidence in the light most favorable to the Commonwealth, this argument fails.  See Latimore, 378 Mass. at 676-677.  Officers patrolling

7

the area shortly after the crimes did not see any people or cars in the area where the phone was found until the juvenile was located walking alone around 2:55 A.M.  Although not the only possible scenario, it is reasonable and possible to conclude that the defendant was not a getaway driver or car passenger, and therefore, that the Commonwealth met its burden to reasonably exclude this hypothesis.  Schoener, 491 Mass. at 714.

Finally, to the extent that the defendant argues that the evidence was insufficient because there were discrepancies in the father's testimony concerning the height of the defendant, this was an issue for the fact finder to resolve, and it does not affect the sufficiency analysis.  See Commonwealth v. Duncan, 71 Mass. App. Ct. 150, 153 n.5 (2008), quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (it is "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").

Judgments affirmed.

By the Court (Meade, Blake & Desmond, JJ.[6]),

Anne M. Thomas
Assistant Clerk

Entered:  February 8, 2024.

---

[6] The panelists are listed in order of seniority.

8