SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. TYRONE STRONG

 
 Docket:
 SJC-13464
 
 
 Dates:
 October 9, 2024 - December 19, 2024
 
 
 Present:
 Budd, C.J., Gaziano, Wendlandt, Georges, & Wolohojian, JJ.
 
 
 County:
 Worcester
 

 
 Keywords:
 Homicide. Felony-Murder Rule. Robbery. Practice, Criminal, Assistance of counsel, Verdict, Instructions to jury, New trial, Capital case. Constitutional Law, Assistance of counsel. Evidence, Identity, Inference, Joint enterprise. Joint Enterprise. Identification.
 
 

       Indictment found and returned in the
Superior Court Department on December 22, 2015.
      The case was tried before Richard T.
Tucker, J.; and a motion for a new trial, filed on December 20, 2021, was heard
by Valerie A. Yarashus, J.
      Donald A. Harwood for the defendant.
      Anne S. Kennedy, Assistant District
Attorney, for the Commonwealth.
      WENDLANDT, J.  The defendant, Tyrone Strong, and his three
coventurers planned to rob a known drug dealer, Christian Perez (victim), at
gunpoint.  During the armed robbery,
which occurred in Fitchburg, the victim was fatally shot.  Two of the defendant's coventurers were found
not guilty -- each in separate trials -‑ and a third coventurer successfully
moved to dismiss his indictment under Commonwealth v. McCarthy, 385 Mass. 160
(1982).  The defendant's fate was not
similar; although the evidence against him was largely circumstantial,
following a separate trial, a jury found the defendant guilty of murder in the
first degree, based on a theory of joint venture in a felony-murder, with a
predicate felony of armed robbery. 
G. L. c. 265, § 1.
      Following his conviction, the defendant
brought a motion for a new trial, contending that he received ineffective
assistance of counsel, that the "rule of consistency" requires
reversal of his conviction in view of the acquittals of two coventurers and the
dismissal of one coventurer's indictment, and that reference in the jury
instructions to the coventurer whose indictment was dismissed was
improper.  The motion judge, who was not
the trial judge, denied the motion.
      In this consolidated appeal, the defendant
challenges the sufficiency of the evidence identifying him as one of the
perpetrators of the armed robbery and murder. 
He further contends that the motion judge abused her discretion in
denying his motion for a new trial.  He
also asks us to exercise our authority under G. L. c. 278,
§ 33E, to vacate his conviction or to reduce the verdict to a lesser
degree of guilt.
      Having carefully examined the record and
considered the defendant's arguments, we conclude that the evidence was
sufficient to support the conviction, and there was no error that would warrant
a new trial.  Nor do we discern any
reason to exercise our extraordinary authority under G. L. c. 278,
§ 33E, to vacate the conviction, or to reduce the verdict of murder in the
first degree to a lesser degree of guilt. 
Accordingly, we affirm the conviction as well as the denial of his
motion for a new trial.
      1. 
Background.  Because the defendant
challenges the sufficiency of the evidence, we recite the facts from the
evidence presented at trial in the light most favorable to the Commonwealth.  See Commonwealth v. Silva, 431 Mass. 401, 403
(2000). 
      a. 
Shooting.  On September 2, 2003,
at approximately 8:37 P.M., a Fitchburg resident heard multiple
gunshots.  Looking out his second-floor
window toward the sidewalk below, he saw two dark-skinned men wearing bandannas
or durags on their heads and speaking to the driver of what he believed to be a
maroon or burgundy vehicle.  Afraid of
being seen peering down at the unfolding scene, the resident stepped away from
the window.  Regaining his composure, he
returned to his window; from this vantage point, he saw the two men wearing
durags walk toward Route 2 and the brake lights of the vehicle as it traveled
in the opposite direction.  The resident,
a self-described "car enthusiast," observed that the vehicle was a
late-model Cadillac with vertical taillights and a light-colored vinyl roof.
      At 8:38 P.M., an officer on patrol
received a call to respond to the scene of the shooting.  Arriving within minutes, he saw a man
standing on the side of the road with a gunshot wound to his shoulder.[1]  Further down the road, the officer saw an
Acura sedan that had crashed into a parked vehicle.  When he approached the Acura, the officer saw
the victim, who had suffered a gunshot wound to his head; United States currency
was visible in the Acura's backseat. 
Although the victim was a known drug dealer who had traveled to
Fitchburg that evening to sell illegal drugs, the officer found no weapons or
drugs in the Acura.  The officer
requested emergency medical services and air medical transport.  In addition to the gunshot wound to his head,
the victim had been shot in the lower left back and the left thigh; he did not
survive his injuries. 
      b. 
Defendant's arrest.  Shortly after
the shooting, at approximately 9 P.M., a State police trooper received a
"be on the lookout" (BOLO) notification for a late-model red Cadillac
with a tan touring roof and two Black men wearing durags on their heads.  The trooper and his colleague stationed their
cruiser approximately fifteen miles east of Fitchburg on Route 2 eastbound;
there, they monitored traffic.  After
approximately one-half hour, a late-model green Cadillac with a tan roof caught
the trooper's attention.  
      Knowing that a tan touring roof was
"very unusual" and believing that the vehicle's long taillights when
braking at night might cause a witness to mistake the color of the car, the
trooper and his colleague decided to follow the Cadillac.  When the colleague pulled the cruiser
alongside the Cadillac, the trooper illuminated the interior of the vehicle and
observed four dark-skinned men, two of whom were wearing durags.
      In view of the substantial similarities
with the BOLO notification, the trooper and his colleague suspected that the
Cadillac and its occupants had been involved in the Fitchburg shooting.  They decided to conduct a "felony
stop";[2] the area was rural, unlit, and surrounded by trees.  While his colleague used the cruiser's sound
system to issue instructions for the Cadillac's occupants to roll down the
windows and place the keys on the roof of the vehicle, the trooper noticed that
the two rear seat passengers, including the defendant, were kneeling on the
seat, looking out of the window, and ducking down.  This behavior continued for three to four
minutes before the driver finally rolled down his window in compliance with the
colleague's instructions, and the occupants got out of the car one at a
time.  
      The driver, who was wearing a durag, was
Tony Ancrum.  The front seat passenger
was Giovanni Rivera.  The defendant
occupied the rear seat on the driver's side of the vehicle.  The fourth passenger, who was in the rear
passenger's side of the vehicle and was also wearing a durag, was Mitchell
Rivera, Giovanni's brother.[3]
      The trooper searched Ancrum and found a
large folding knife and a swath of a ripped white towel.  After placing the four men in handcuffs, the
trooper returned to the Cadillac to conduct a preliminary search for weapons.  He noticed that the passenger's side of the
back seat -- where Mitchell had been sitting -- was askew, as if someone had
been pulling on it, and the corner of the seat was loose.  When other troopers arrived to assist, a more
thorough search of the vehicle revealed two loaded firearms and over fifty grams
of cocaine -- roughly the size of a fist -- under the back seat.  A third loaded firearm eventually was located
under the hood of the Cadillac.  It was
wrapped in a towel fragment matching the towel swath found on Ancrum.  
      The three firearms were sent to a
laboratory for testing, but none was determined to be the murder weapon.  At trial, the prosecution's theory was that
each of the four men had been armed and that the murder weapon had been
discarded by the time the Cadillac was stopped.
      Also on the back seat was a "Burger
King" bag, which contained hamburgers that were warm to the touch.  Officers later learned that at
8:53 P.M., approximately fifteen minutes after the shooting, Giovanni's
cellular telephone had received a call from the landline telephone of a Burger
King quick service restaurant located near Route 2 on the Fitchburg-Leominster
line, which was not far from the scene of the shooting.
      Several items belonging to the victim
eventually were also recovered from the Cadillac.   The items included two compact discs (CDs)
inscribed with the names "Nancy" and "Edgar"; these CDs had
previously belonged to the victim's friends and had been in the victim's Acura
just prior to the shooting.  In addition,
a CD case, which also had been in the victim's Acura and which contained CDs
marked "Ysabel," the name of the mother of two of the victim's
children, was also found in the Cadillac. 
Also recovered from the Cadillac and missing from the victim's Acura
were two "JVC" remote controls for the victim's car stereo, a battery
charging port for a video camera, a cellular telephone charger, and a wiring
harness with frayed wires that fit into the wiring harness from the dashboard
of the victim's Acura.  Finally, the
victim's silver and black "Movado"-brand watch was found on Mitchell.

      The four men were taken into custody;
after being read the Miranda warnings, the defendant agreed to be
interviewed.  The defendant asserted that
he had never been to Fitchburg.  He
claimed that he and his friends arranged to meet women in Shirley that evening,
and that they had left the Roxbury section of Boston at 6 or 7 P.M.  He also stated that they had stopped at a
convenience store or gasoline station in Shirley.  
      The men were tested for the presence of
gunshot residue, but no test results came back positive.  The lead investigator testified that gunshot
residue is a fine powder that can be wiped, washed, or rubbed off, and that the
reliability threshold for gunshot residue testing is four hours, which the
investigator testified had already passed by the time the defendant was tested.[4]
      c. 
Ballistics and footwear prints. 
Meanwhile, at the scene of the shooting, officers recovered seven shell
casings on the side of the road, all of which were determined to have been
fired by the same nine millimeter firearm. 
As noted supra, the murder weapon was not recovered.
      The prosecution's footwear expert found
eleven footwear prints in sand on the sidewalk near the recovered shell casings.  The expert compared the footwear impressions
at the scene to the footwear worn by the four men in custody.  He opined that the shoes worn by Ancrum, size
9.[5] "Nike Air Force Ones," the shoes worn by Giovanni, size 10.5
"Nike Air Huaraches," and the shoes worn by the defendant, size
eleven "Adidas Samoas," could have made several of the impressions
found at the scene.5  The expert
acknowledged that the footwear impressions lacked individual characteristics
further linking the impressions to the exact shoes worn by the defendant,
Ancrum, and Giovanni beyond the size and manufacturing design.[6]  When photographing the defendant's shoe for
comparison to the impressions, the expert noticed that the bottom was caked in
sand.  In his closing argument, trial counsel
highlighted the lack of precision in the footwear impression evidence to
challenge the prosecution's evidence of identification.  
      d. 
Call logs and cell site location information.  Based on telephone call histories from the
cellular telephones used by the coventurers and by several other individuals,
officers developed a timeline for the day of the shooting.[7]  They discovered several calls between
Giovanni and Josue Martinez.  Martinez,
who was acquainted with Giovanni from his teenage years in Boston, knew that
the victim was reputed to be a drug dealer.[8]
      Martinez testified that, on the day of the
shooting, Giovanni, Ancrum, Mitchell, and the defendant[9] arrived at his
Fitchburg home at around 6 P.M. and stayed for approximately two hours.  While at Martinez's home, Mitchell placed
several calls to the victim.  Mitchell
placed the final call to the victim at 7:58 P.M., approximately forty
minutes prior to the shooting.[10]  At
trial, the prosecution theorized that during these calls, the coventurers
arranged to meet with the victim, ostensibly to buy drugs from him, but that
the coventurers actually planned to rob him of his drugs and money.  Consistent with this theory, the victim had
traveled from Worcester to Fitchburg with a plan to sell drugs.
      From 7:54 P.M. until 8:36 P.M.,
the telephone records show numerous calls between Giovanni and Mitchell.[11]  Calls between the coventurers resumed at
8:40 P.M., minutes after the shooting, with a series of unanswered calls
from Ancrum and Giovanni to Mitchell. 
Thereafter, Giovanni received a call from the landline telephone of a
Burger King quick service restaurant near the crime scene at
8:53 P.M.  Cell site location
information (CSLI) indicated that several of the cellular telephone calls, which
were placed in the minutes before and immediately following the shooting, were
routed through a cell tower located directly across the street from where the
victim was shot.
      2. 
Procedural history.  Following a
jury trial, the defendant was convicted of murder in the first degree based on
a theory of joint venture in a felony-murder, with a predicate felony of armed
robbery.[12]  See G. L. c. 265,
§ 1.[13]  The defendant timely filed
a notice of appeal.  Thereafter, the
defendant filed a motion for a new trial. 
In a thorough, well-reasoned opinion, the motion judge, who was not the
trial judge, denied the motion.  We
consolidated the defendant's timely appeal from the denial of his motion for a
new trial with his direct appeal.
      3. 
Discussion.  The defendant
challenges the sufficiency of the evidence identifying him as a joint
venturer.  He also contends that the
motion judge abused her discretion in denying the defendant's motion for a new
trial because the defendant was provided with ineffective assistance of
counsel, because the defendant's conviction violates the "rule of
consistency" in light of the acquittals of Ancrum and Giovanni in separate
trials and the dismissal of Mitchell's indictment under McCarthy, 385 Mass.
160, and because the trial judge improperly included reference to Mitchell in
his instructions to the jury despite the dismissal of Mitchell's
indictment.  We address each argument in
turn. 
      a. 
Sufficiency of the evidence of identity. 
We assess the sufficiency of the evidence based on "whether, after
viewing the evidence in the light most favorable to the prosecution, any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt" (citation omitted).  Commonwealth v. Kapaia, 490 Mass. 787, 791
(2022).  "A conviction may rest
exclusively on circumstantial evidence, and, in evaluating that evidence, we
draw all reasonable inferences in favor of the Commonwealth."  Commonwealth v. Javier, 481 Mass. 268, 279
(2019), quoting Commonwealth v. Jones, 477 Mass. 307, 316 (2017).  "[T]he inferences a jury may draw need
only be reasonable and possible and need not be necessary or inescapable"
(citation omitted).  Kapaia, supra.
      Here, the defendant argues that the
evidence did not warrant a finding beyond a reasonable doubt that he was one of
a group of perpetrators who killed the victim in the course of an armed
robbery.  He contends that the footwear
impression evidence was the only evidence tying him to the scene of the
shooting.  And, relying on Commonwealth
v. Morris, 422 Mass. 254, 257 (1996), a case concerning fingerprint evidence,
he further maintains that the footwear impression evidence was insufficient in
the absence of proof as to when the impressions were left.  See Morris, supra (reversing conviction where
only identification evidence was defendant's thumbprint on mask found at crime
scene absent evidence that print was made during crime's commission).  See also Commonwealth v. Anitus, 93 Mass.
App. Ct. 104, 108 (2018) (applying Morris in context of deoxyribonucleic acid
[DNA] evidence and concluding that such evidence, without more, was
insufficient to identify defendant as one of two perpetrators, absent proof as
to when DNA was deposited on moveable items found at crime scene).  
      The defendant's argument falters on its
premise.  As detailed supra, the footwear
impression evidence was not the only evidence tying the defendant to the armed
robbery and the shooting.  Briefly, the
defendant was in Martinez's Fitchburg home, alongside his coventurers, in the
several hours before the victim was shot. 
During that time, telephone records showed that the coventurers placed
multiple calls to the victim, whom Martinez knew to be a drug dealer.  The last call to the victim was placed just
forty minutes before the shooting.  For
his part, the victim had left Worcester and planned to sell drugs in Fitchburg
that evening.  This evidence permitted
the jury to infer reasonably that the defendant and his coventurers concocted a
ruse to lure the victim to the crime scene; specifically, they arranged a
meeting with the victim ostensibly to purchase drugs in order instead to rob
the victim, whom they knew to be a drug dealer and thus likely to be carrying,
at the least, valuable illegal drugs.
      The defendant and his coventurers together
left Martinez's home shortly after the last call to the victim.  They were traveling in a late-model green
Cadillac with a tan touring roof.  The
CSLI evidence showed that the defendant's coventurers were near the scene at
the time of the shooting.  
      In this context, the evidence that
footwear impressions, which matched the defendant's and two of his coventurers'
footwear, were left in the sand near the scene of the shooting together with
the evidence that the defendant's shoe when he was arrested shortly after the
murder was caked in sand, supports the inference that the defendant was with
his coventurers at the scene.  To be
sure, the testimony regarding the footwear impressions was inconclusive insofar
as many individuals have the same type, model, and size shoes as those worn by
the defendant; nonetheless, the additional information that footwear
impressions matching the types, models, and sizes of two of his coventurers
also were at the scene suggested that the defendant, who had left Martinez's
home with the coventurers in the Cadillac at approximately 8 P.M., and at least
two coventurers were together at the scene of the shooting.  From this evidence, including the CSLI
evidence regarding the presence of the coventurers at the scene at the time of
the shooting, a jury could infer reasonably that the defendant was with his
coventurers at the scene of the crime during the armed robbery and
shooting.  
      Confirming this inference, a late-model
Cadillac with a tan touring roof was spotted at the scene of the shooting
immediately following the shooting. 
Martinez testified that the defendant and his coventurers arrived in
Fitchburg in that vehicle; that same vehicle was stopped headed back to Boston
with the defendant and his coventurers inside. 
Ancrum and Mitchell matched the general description -- dark-skinned men
wearing durags -- given by the Fitchburg resident of the men he saw at the
scene.  The warm hamburgers in the Burger
King bag suggested that they recently had been at the quick service restaurant
near the crime scene; Giovanni had received a call from the restaurant in the
moments following the fatal shooting.
      Inside the Cadillac in which the defendant
and his coventurers traveled were items taken from the victim, including
personalized items –- the two CDs bearing the victim's friends' names
"Nancy" and "Edgar" and the CD case with CDs labeled
"Ysabel," which was the name of the mother of two of the victim's
children; these items had been in the victim's possession on the evening of the
shooting.  Additionally, three loaded
firearms were found hidden in the Cadillac, along with a large quantity of
cocaine and the victim's stereo system. 
From this evidence, the jury could have found that the defendant and his
coventurers were each armed during the robbery of the victim, that they had
disposed of the murder weapon, and that they had taken the victim's property
from the victim at gunpoint.
      The jury also heard evidence suggesting
consciousness of guilt, which alone cannot support the defendant's conviction
but "is probative of the defendant's guilty state of mind."  See Commonwealth v. Shakespeare, 493 Mass.
67, 85 (2023), quoting Commonwealth v. Salemme, 395 Mass. 594, 601 (1985).  During his interview, the defendant told
officers that he had been in Shirley to meet women, stopping only at a gasoline
station or convenience store.  This alibi
was belied by Martinez, who testified that the defendant and his coventurers
were in Martinez's Fitchburg home for approximately two hours prior to the
shooting.  During this time, as discussed
supra, the coventurers made several calls to the victim, a known drug dealer.  
      In addition, after being stopped by State
police, the defendant and his coventurers were slow to respond to police
instructions.  Instead, for three to four
minutes, the defendant and Mitchell kneeled on the back seat of the Cadillac,
turned around, and ducked down.  The back
seat where they had been engaging in these behaviors was askew when the
troopers examined it and underneath it lay a large quantity of cocaine and two
loaded firearms.  
      In sum, the prosecution introduced
abundant evidence, albeit circumstantial, linking the defendant to the
murder.  Accordingly, we need not reach
the defendant's contention that, like fingerprint evidence, where footwear
impression evidence is the only identification evidence the prosecution must
introduce proof that the footwear impressions were placed at the crime scene
during the commission of the crime.  See
Commonwealth v. LaCorte, 373 Mass. 700, 703 (1977) (noting but declining to
reach argument regarding required proof "that the fingerprints in fact
were placed at the scene during the commission of the crime" where
prosecutor "introduced abundant evidence" tying defendant to
murder).  
      b. 
Ineffective assistance of counsel. 
We turn now to the defendant's claim that the motion judge abused her
discretion in denying the defendant's motion for a new trial based on the
defendant's contention that he received ineffective assistance of counsel.  We review the denial of a motion for a new
trial "to determine whether there has been a significant error of law or
other abuse of discretion." 
Commonwealth v. O'Brien, 494 Mass. 288, 296 (2024), quoting Commonwealth
v. Fernandes, 492 Mass. 469, 475 (2023). 
Where, as here, the motion judge did not preside at trial and did not
hold an evidentiary hearing, "we regard ourselves in as good a position as
the motion judge to assess the trial record."  O'Brien, supra, quoting Commonwealth v.
Kirkland, 491 Mass. 339, 346 (2023).
      "When reviewing a defendant's appeal
from the denial of a motion for a new trial in conjunction with the direct
appeal of a conviction of murder in the first degree, 'we do not evaluate [the]
ineffective assistance claim under the traditional standard set forth in
Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).'"  Commonwealth v. Gibson, 492 Mass. 559, 568
(2023), quoting Commonwealth v. Melendez, 490 Mass. 648, 656-657 (2022).  "Instead, we apply the more favorable
standard of G. L. c. 278, § 33E, and review the defendant's
claim for a substantial likelihood of a miscarriage of justice."  Gibson, supra.  This standard requires us to determine
"'whether defense counsel committed an error in the course of trial,' and
if there was error . . . 'whether it was likely to have influenced
the jury's conclusion.'"  Id.,
quoting Commonwealth v. Ayala, 481 Mass. 46, 62 (2018).  "Where a defendant challenges tactical
or strategic decisions by trial counsel, the court will find ineffective
assistance 'only if such a decision was manifestly unreasonable when
made.'"  Commonwealth v. Weaver, 474
Mass. 787, 808 (2016), aff'd, 582 U.S. 286 (2017), quoting Commonwealth v.
Diaz, 448 Mass. 286, 288 (2007).
      The defendant argues that trial counsel
was constitutionally ineffective because he failed to investigate the window of
time during which the footwear impressions could have been left in the sand at
the scene by not obtaining meteorological information or asking the defense
expert to opine on the time frame. 
Following his conviction, the defendant retained the same footprint
expert, James Streeter, who had been retained by trial counsel, see note 6,
supra, and also retained a meteorologist, Fred Campagna.  According to their affidavits, considering
the weather conditions on the day of the shooting, the footwear impressions
could have been left as early as 11:30 A.M.  The defendant argues that trial counsel's failure
to investigate the timing of the impressions was not a strategic decision.  In support of this claim, the defendant
relies on Streeter's affidavit in which Streeter averred that trial counsel
never asked him to render an opinion as to when the impressions could have been
made.  Although trial counsel passed away
before the defendant's motion for a new trial, we have a glimpse into counsel's
decision-making process.  In a motion for
a required finding of not guilty at the close of the Commonwealth's case, trial
counsel stated:
"The only
evidence that places [the defendant] at [the crime scene] on [the day of the
shooting] is the [footwear] impressions. 
There is no evidence when those impressions were made.  Most importantly, [the prosecution's footwear
expert] testified that those impressions could have been made by [the
defendant] or by someone else with shoes of the manufacturer, style, and
size."  (Emphasis added.)
Trial counsel
thus considered the lack of evidence as to when the footwear impressions were
made.  Yet, he did not raise the issue in
his closing argument, suggesting that counsel made a strategic decision to
focus the defense on the absence of any direct evidence tying the defendant to
the crime scene.   
      The defendant has not shown that trial
counsel's decision to focus on the argument that the defendant was simply not
at the crime scene at all, as opposed to arguing also or alternatively that he
may have been at the crime scene but earlier on the day of the shooting, was
manifestly unreasonable.  See
Commonwealth v. Rhodes, 482 Mass. 823, 828 (2019) (acknowledging that
"[t]here is nothing wrong with a defense strategy that follows the
advice . . . to 'put all your eggs in one basket'");
Commonwealth v. Kolenovic, 471 Mass. 664, 675-676 (2015), S.C., 478 Mass. 189
(2017) (holding that defense counsel's decision to not pursue defense that
"would require riding 'two horses'" in favor of viable alternative
was not constitutionally ineffective assistance); Commonwealth v. Glover, 459 Mass.
836, 842-844 (2011) (holding that it is not manifestly unreasonable for defense
counsel to argue only one of two available theories).  See also Commonwealth v. Velez, 487 Mass.
533, 546 (2021), quoting Commonwealth v. Epps, 474 Mass. 743, 758 (2016) ("an
evaluation of trial counsel's performance involves weighing the strength of an
asserted defense 'relative to the availability and strength of other potential
defenses'").
      Evidence that the footwear impressions
could only have been left after 11:30 A.M. on the day of the shooting
would have narrowed the time frame for when the prints were left and thus may
not have helped the defendant.  Indeed,
the defendant's own statement was that he had not left his home in Roxbury
until 6 or 7 P.M., and Martinez testified that the defendant had been at his
home until approximately 8 P.M.  In view
of the defendant's statement and Martinez's testimony, it was not unreasonable
for trial counsel to have determined that showing that the footwear impressions
could have been left earlier in the day would not have been helpful.
      By contrast, the defense pursued by trial
counsel -- that the defendant was not at the crime scene -- aligned with the
defendant's statements to police that he had arranged to meet women in Shirley
on the night that the shooting occurred, that he had not been to Fitchburg on
that night, and that he had been to a convenience store or gasoline station in
Shirley.  In light of these statements,
trial counsel's decision to focus on the inconclusiveness of the footwear
prints was a stronger defense than possibly contradicting the defendant with
evidence that he -- or someone with the exact same shoe model and size -- was
at the scene sometime after 11:30 A.M. on the day of the shooting.  See Velez, 487 Mass. at 546.  The defendant thus has not shown that trial
counsel's strategy was "manifestly unreasonable" resulting in a
"substantial likelihood of a miscarriage of justice."  See Gibson, 492 Mass. at 568; Weaver, 474
Mass. at 808.
      c. 
Consistency of the verdicts.  The
defendant next contends that his conviction under a theory of joint venture
violates the "rule of consistency" where his coventurers were
acquitted in separate jury trials or had the indictment for felony-murder
dismissed.  This court has reversed
inconsistent convictions in limited circumstances.  See Commonwealth v. Medeiros, 456 Mass. 52,
58 (2010).  The doctrine may apply where
the following three elements are met: 
(1) "a crime charged that by its nature requires a combination of
individuals," e.g., conspiracy; (2) "a single trial of all the
participants in that crime"; and (3) "an acquittal of all but one of
the participants."[14]  Id. at
59.    
      We have previously determined that a
conviction under a theory of joint venture does not satisfy the first
element.  See Commonwealth v. Fluellen,
456 Mass. 517, 520-522 (2010) ("We have not applied the rule of
consistency to inconsistent verdicts in joint venture trials [as we have to
those in conspiracy trials], because the first element, a crime that requires a
combination of individuals, is generally not satisfied").  Such a conviction may stand even though the
coventurers are not charged with the same offense, the identity of the
principal is unknown, or the principal is acquitted.  See Commonwealth v. Tague, 434 Mass. 510, 513
(2001), cert. denied, 534 U.S. 1146 (2002). 
Unless the Legislature has made commission of a crime by joint
enterprise an element of the crime, "we have not required reversal where
defendants are tried together for their alleged involvement in a single crime
[as joint venturers], and one is convicted and the other acquitted, or where
they are tried separately and different verdicts are returned" (citations
omitted).  Medeiros, 456 Mass. at 57.
      Moreover, there was not a single trial of
all the participants; instead, Ancrum and Giovanni were acquitted in separate
trials.  See Commonwealth v. Jones, 403
Mass. 279, 289-290 (1988) ("There is nothing inconsistent between one
jury's finding that there was insufficient evidence to prove [one joint
venturer's] guilt beyond a reasonable doubt, and another jury's finding, in a
separate trial, that there was sufficient evidence to prove the defendant's
guilt to that degree of certainty"). 
      d. 
Jury instructions.  The defendant
next asserts that the trial judge improperly instructed the jury on joint
venture insofar as the judge instructed the jury to consider the conduct of
Mitchell, whose indictment was dismissed pursuant to McCarthy, 385 Mass. 160.[15]  Jury instructions on joint venture are
appropriate where the nature of the evidence suggests the possibility that more
than one individual participated in the crime. 
See Commonwealth v. Dyer, 389 Mass. 677, 683 (1983).  Here, the evidence supported a reasonable
inference that the defendant, Ancrum, Giovanni, and Mitchell jointly planned to
rob the victim at gunpoint, and that the victim was shot during the armed
robbery.  Thus, the trial judge did not
err.  See id.
      Moreover, although Mitchell's indictment
was dismissed on the basis of the evidence presented to the grand jury,[16] it
was proper to instruct the jury that they could consider whether Mitchell had
been a coventurer with the others because the evidence presented at the
defendant's trial reasonably suggested Mitchell's participation in the joint
enterprise.  See, e.g., Commonwealth v.
Mattos, 404 Mass. 672, 681 (1989) (jury instruction on joint venture was proper
even where coventurer's indictment was nol prossed).
      This evidence included, inter alia, that
Mitchell was with the defendant and the two other coventurers at Martinez's
Fitchburg home in the hours before the shooting; that the cellular telephone
that Mitchell had borrowed from a friend was used to call the victim, inferably
to set up a meeting to purchase drugs as a ruse to rob the victim, a known drug
dealer; that Mitchell matched the general description of one of the assailants
provided by a witness; that Mitchell was traveling alongside the defendant and
the two other coventurers in the late-model Cadillac with a tan touring roof
before the shooting and shortly after the shooting; that two firearms and
cocaine were found underneath the seat where Mitchell was sitting; that, like
the defendant, Mitchell was engaged in movements suggesting he was hiding
evidence despite law enforcement officers' commands during the felony stop;
that Mitchell wore the victim's watch when he was arrested; that a Burger King
bag with warm hamburgers, inferably from the quick service restaurant that had
contacted Giovanni just moments after the shooting, was near Mitchell in the
backseat of the Cadillac; and that other items taken from the victim were later
found in the Cadillac in which Mitchell and the other coventurers were
traveling. 
      e. 
Review under G. L. c. 278, § 33E.  Finally, having considered the defendant's
arguments and after our own independent and thorough review of the record, we
discern no reason to exercise our extraordinary power pursuant to G. L.
c. 278, § 33E, to vacate his conviction or to reduce the verdict in
the interest of justice.  
      4. 
Conclusion.  The defendant's
conviction of murder in the first degree and the denial of his motion for a new
trial are affirmed.
So ordered.

footnotes

[1] This man was
identified as Jiovanni Espiritu Santos; he survived his injuries.  Espiritu Santos did not speak English and was
not interviewed by the officers who testified at trial.  His whereabouts at the time of trial were
unknown, and the Commonwealth did not offer any testimony from him.

[2] A
"felony stop," the trooper explained, is one where an officer
believes, based on training and experience, that a crime constituting a felony
has been committed and the stop presents a danger to the officer's life.

[3] Because
Giovanni and Mitchell Rivera share a surname, we refer to them by their first
names.

[4] At a bench
conference, trial counsel referenced a report indicating that the gunshot
residue test was conducted within the four-hour time frame.  And during a pretrial hearing regarding the
defendant's motion to dismiss, trial counsel produced a gunshot residue report
stating that the defendant was swabbed within four hours after the shooting
occurred.  This report was not admitted
in evidence at trial.

[5] The expert
excluded the shoes worn by Mitchell from the footwear impressions at the scene,
as well as shoes worn by the victim and the second shooting victim.  See note 1, supra.

[6] Trial counsel
also retained a footwear print expert, who testified that while the footwear
impressions lacked individual characteristics and were
"non-conclusive," the class characteristics of size, shape, and
design meant that the defendant's shoe "could have made" the
impressions at the scene of the shooting.

[7] The defendant
had left his cellular telephone in Roxbury on the evening of the shooting.  Mitchell had borrowed a cellular telephone
belonging to a friend.

[8] Martinez
later learned that there had been some dispute between his girlfriend and the
victim, but he testified that he was not aware of the dispute prior to the
shooting.  

[9] Martinez was
acquainted with the defendant, whom he called "T."  Martinez also recognized the green Cadillac
driven by Ancrum; he testified that on a previous occasion the group had gone
to a club in the Cadillac.  

[10] During the
visit on the day of the shooting, the group smoked marijuana, ate, and talked
before Martinez retired to his girlfriend's bedroom.  He was in the bedroom when the coventurers
left.  

[11] From
8:15 P.M. to 8:27 P.M., telephone records also show several calls
placed from Martinez to Mitchell.

[12] Prior to the
trial, the prosecution dismissed indictments charging the defendant with
carrying a firearm without a license, G. L. c. 269,
§ 10 (a), and unlawful possession of ammunition, G. L.
c. 269, § 10 (h) (1).

[13] The
defendant's trial commenced prior to our decision in Commonwealth v. Brown, 477
Mass. 805 (2017), cert. denied, 586 U.S. 826 (2018), prospectively abolishing
common-law felony-murder as an independent basis for murder in the first degree
without proving malice.

[14] The doctrine
also applies where a guilty verdict is "impossible at law," e.g.,
where a defendant is convicted of mutually exclusive charges such as larceny
and receipt of the same stolen goods. 
Medeiros, 456 Mass. at 58, citing Commonwealth v. Haskins, 128 Mass. 60,
61 (1880).  The defendant rightly does
not contend that his conviction falls within this limited category.

[15] Contrary to
the defendant's assertions, the trial judge did not instruct the jury on
conspiracy and Mitchell's statements were not admitted in evidence.

[16] We express
no opinion as to the correctness of the trial judge's allowance of Mitchell's
McCarthy motion.